OPINION OF THE COURT
Bellacosa, J.
 The bicameral "recall” practice used by the Legislature to reacquire Assembly Bill No. 9592-A of 1990 from the Governor’s desk is not authorized by article IV, § 7 of the New York State Constitution. The Constitution prescribes the respective powers of the Executive and the Legislative Branches as to how a passed bill becomes a law or is rejected. The order of the Appellate Division, therefore, should be reversed and the challenged procedure should be declared unconstitutional, but only prospectively.
Assembly Bill No. 9592-A, entitled "an act to amend the agriculture and markets law, in relation to the siting of solid waste management-resource recovery facilities within agricultural districts,” was passed by the Assembly and the Senate on June 28, 1990 and June 29, 1990, respectively. It was formally sent to the Governor on July 19, 1990. The next day, according to the official journals of the Legislature, the Assembly adopted a resolution, with which the Senate concurred, requesting that the Governor return the bill to the Legislature. The Executive Chamber accommodated the request on the same day.
Appellants brought their combined CPLR article 78 and declaratory judgment action seeking a ruling (1) that the method used by the Legislature to retrieve the passed bill is unconstitutional; and (2) that the passed bill, in effect, automatically became law because the Governor failed to act on it within 10 days of its delivery to his desk on July 19, 1990. Supreme Court dismissed the action and the Appellate Division modified to declare the recall practice constitutional. Appellants are before this Court by an appeal taken as of right on a substantial constitutional issue.
*251 L
Preliminarily, the State defendants argue that the Judicial Branch may not review the constitutionality of this recall practice, as it would be an intrusion on the inviolate roles of the separate law-making Branches. We conclude that the courts do not trespass "into the wholly internal affairs of the Legislature” (Heimbach v State of New York, 59 NY2d 891, 893, appeal dismissed 464 US 956) when they review and enforce a clear and unambiguous constitutional regimen of this nature. In Heimbach v State of New York (supra), by sharp contrast, the internal procedural issue involved how the Clerk of the Senate recorded and certified a roll call of votes (compare, Matter of Board of Educ. v City of New York, 41 NY2d 535, 538). Our precedents are firm that the "courts will always be available to resolve disputes concerning the scope of that authority which is granted by the Constitution to the other two branches of the government” (Saxton v Carey, 44 NY2d 545, 551; New York State Bankers Assn. v Wetzler, 81 NY2d 98, 102; see also, Myers v United States, 272 US 52, 116; Matter of New York State Inspection, Sec. & Law Enforcement Empls. v Cuomo, 64 NY2d 233, 239). That is precisely what is being done here (see, Wolfe v McCaull, 76 Va 876, 880 [1882] [constitutionality of recall procedure is a justiciable issue]).
The internal rules of the Assembly and the Senate, which reflect and even purport to create the recall practice, are entitled to respect. However, those rules cannot immunize or withdraw the subsisting question of constitutional law-making power from judicial review. Since the authority of the Legislature is "wholly derived from and dependent upon the Constitution” (Matter of Sherrill v O’Brien, 188 NY 185, 199), the discrete rules of the two houses do not constitute organic law and may not substitute for or substantially alter the plain and precise terms of that primary source of governing authority. The rule-making authority of article III, § 9 prescribes that "[e]ach house shall determine the rules of its own proceedings” (emphasis added). Contrary to the assertion of the dissent, that authorization cannot justify rules which extend beyond the Legislature’s "own proceedings” and are inextricably intertwined with proceedings pending entirely before the Executive. These rules substantially affect Executive proceedings after the Legislature’s proceedings, with respect to a passed bill, have formally ended by transmittal of the passed bill to the Governor’s desk.
The challenged recall practice significantly unbalances the *252 law-making options of the Legislature and the Executive beyond those set forth in the Constitution. By modifying the nondelegable obligations and options reposed in the Executive, the practice compromises the central law-making rubrics by adding an expedient and uncharted bypass. The Legislature must be guided and governed in this particular function by the Constitution, not by a self-generated additive (see, People ex rel. Bolton v Albertson, 55 NY 50, 55).
IL
Article IV, § 7 of the State Constitution prescribes how a bill becomes a law and explicitly allocates the distribution of authority and powers between the Executive and Legislative Branches. The key provision grants law-making authority from the People as follows:
"[e]very bill which shall have passed the senate and assembly shall, before it becomes a law, be presented to the governor; if he approve, he shall sign it; but if not, he shall return it with his objections to the house in which it shall have originated * * * [ijf any bill shall not be returned by the governor within ten days (Sundays excepted) after it shall have been presented to him, the same shall be a law in like manner as if he had signed it” (emphasis added).
The description of the process is a model of civic simplicity: (1) Approval; (2) Rejection by Veto; or (3) Approval by Inaction. The Constitution thus expressly creates three routes by which a passed bill may become a law by gubernatorial action or inaction or be rejected by veto.
The putative authority of the Legislature to recall a passed bill once it has been formally transmitted to the Governor "is not found in the constitution” (People v Devlin, 33 NY 269, 277). We conclude, therefore, that the practice is not allowed under the Constitution. To permit the Legislature to use its general rule-making powers, pertaining to in-house procedures, to create this substantive authority is untenable. As this Court stated in Devlin "[wjhen both houses have * * * finally passed a bill, and sent it to the governor, they have exhausted their powers upon it” (id., at 277 [emphasis added]). That expression and principle apply with equal force here, even though in Devlin the recall was attempted by only one *253 house rather than both (see, Wolfe v McCaull, 76 Va 876, 883, supra).
When language of a constitutional provision is plain and unambiguous, full effect should be given to "the intention of the framers * * * as indicated by the language employed” and approved by the People (Settle v Van Evrea, 49 NY 280, 281 [1872]; see also, People v Rathbone, 145 NY 434, 438). In a related governance contest, this Court found "no justification * * * for departing from the literal language of the constitutional provision” (Anderson v Regan, 53 NY2d 356, 362 [emphasis added]). As we stated in Settle v Van Evrea:
"[I]t would be dangerous in the extreme to extend the operation and effect of a written Constitution by construction beyond the fair scope of its terms, merely because a restricted and more literal interpretation might be inconvenient or impolitic, or because a case may be supposed to be, to some extent, within the reasons which led to the introduction of some particular provision plain and precise in its terms.
"That would be pro tanto to establish a new Constitution and do for the people what they have not done for themselves” (49 NY 280, 281, supra).
Thus, the State’s argument that the recall method, in practical effect and accommodation, merely fosters the underlying purpose of article IV, § 7 is unavailing (see, New York State Bankers Assn. v Wetzler, 81 NY2d 98, 104, supra).
If the guiding principle of statutory interpretation is to give effect to the plain language (Ball v Allstate Ins. Co., 81 NY2d 22, 25; Debevoise & Plimpton v New York State Dept. of Taxation & Fin., 80 NY2d 657, 661; McKinney’s Cons Laws of NY, Book 1, Statutes §94), "[especially should this be so in the interpretation of a written Constitution, an instrument framed deliberately and with care, and adopted by the people as the organic law of the State” (Settle v Van Evrea, 49 NY, at 281, supra). These guiding principles do not allow for interstitial and interpretative gloss by the courts or by the other Branches themselves that substantially alters the specified law-making regimen. Courts do not have the leeway to construe their way around a self-evident constitutional provision by validating an inconsistent "practice and usage of those charged with implementing the laws” (Anderson v Regan, 53 NY2d 356, 362, supra; see also, People ex rel. Burby v How- *254 land, 155 NY 270, 282; People ex rel. Crowell v Lawrence, 36 Barb 177, affd 41 NY 137; People ex rel. Bolton v Albertson, 55 NY 50, 55, supra).
The New York Legislature’s long-standing recall practice has little more than time and expediency to sustain it. However, the end cannot justify the means, and the Legislature, even with the Executive’s acquiescence, cannot place itself outside the express mandate of the Constitution. We do not believe that supplementation of the Constitution in this fashion is a manifestation of the will of the People. Rather, it may be seen as a substitution of the People’s will expressed directly in the Constitution.
The Governor has been referred to as the "controlling element” of the legislative system (4 Lincoln, The Constitutional History of New York, at 494 [1906]). The recall practice unbalances the constitutional law-making equation, which expressly shifts power solely to the Executive upon passage of a bill by both houses and its transmittal to the Executive. By the ultra vires recall method, the Legislature significantly suspends and interrupts the mandated regimen and modifies the distribution of authority and the complementing roles of the two law-making Branches. It thus undermines the constitutionally proclaimed, deliberative process upon which all people are on notice and may rely. Realistically and practically, it varies the roles set forth with such careful and plain precision in the constitutional charter. The limbo status to which a passed bill is thus consigned withdraws from or allows evasion of the assigned power granted only to the Executive to approve or veto a passed bill or to allow it to go into effect after 10 days of inaction.
Though some practical and theoretical support may be mustered for this expedient custom (see, e.g., 4 Lincoln, op. cit., at 501), we cannot endorse it. Courteous and cooperative actions and relations between the two law-making Branches are surely desirable and helpful, but those policy and governance arguments do not address the issue to be decided. Moreover, we cannot take that aspirational route to justify this unauthorized methodology.
The inappropriateness of this enterprise, an "extraconstitutional method for resolving differences between the legislature and the governor,” also outweighs the claimed convenience (Zimmerman, The Government and Politics of New York State, at 152). For example, "[t]his procedure 'creates a negoti *255 ating situation in which, under the threat of a full veto, the legislature may recall a bill and make changes in it desired by the governor, thus allowing him to exercise de facto amendatory power’ ” (Fisher and Devins, How Successfully Can the States’ Item Veto be Transferred to the President?, 75 Geo LJ 159, 182, quoting Benjamin, The Diffusion of the Governor’s Veto Power, 55 State Govt 99, 104 [1982]).
Additionally, the recall practice "affords interest groups another opportunity to amend or kill certain bills” (Zimmerman, op. cit., at 152), shielded from the public scrutiny which accompanies the initial consideration and passage of a bill. This "does not promote public confidence in the legislature as an institution” because "it is difficult for citizens to determine the location in the legislative process of a bill that may be of great importance to them” (id., at 145, 152). Since only "insiders” are likely to know or be able to discover the private arrangements between the Legislature and Executive when the recall method is employed, open government would suffer a significant setback if the courts were to countenance this long-standing practice.
In sum, the practice undermines the integrity of the lawmaking process as well as the underlying rationale for the demarcation of authority and power in this process. Requiring that the Legislature adhere to this constitutional mandate is not some hypertechnical insistence of form over substance, but rather ensures that the central law-making function remains reliable, consistent and exposed to civic scrutiny and involvement.
We are satisfied also that legitimate correction of mere technical oversights or errors in passed bills may be accomplished by chapter amendments, through messages of necessity and other available mechanisms. It is no justification for an extraconstitutional practice that it is well intended and efficient, for the day may come when it is not so altruistically exercised.
Appellants are entitled, therefore, to a judicial declaration that the recall practice is not constitutionally authorized.
¡IL
The particular remedy and relief appropriate to this case is a critically distinct issue. Appellants seek an order compelling the Secretary of State to execute a certificate that Assembly Bill No. 9592-A became law on or about July 30, 1990. *256 Though the recall practice is not constitutionally authorized, neither is the mandamus relief warranted.
Despite the removal of the subject bill from the Governor’s desk, logic and sound public policy do not compel or persuade us to treat the bill in this case as having been on the Executive’s desk for the requisite 10 days, within the meaning of article IV, § 7. Also, the bill in question lapsed when the 1990 session of the Legislature ended, and resuscitation by judicial decree in the fashion requested would be a disproportionate remedy and would " 'wreak more havoc in society than society’s interest in stability will tolerate’ ” (Gager v White, 53 NY2d 475, 483, cert denied sub nom. Guertin Co. v Cachat, 454 US 1086; see also, Hurd v City of Buffalo, 41 AD2d 402, affd 34 NY2d 628). Prospective application of a new constitutional rule is not uncommon where it would have a "broad, unsettling effect” (Matter of McCann v Scaduto, 71 NY2d 164, 178; see also, Foss v City of Rochester, 65 NY2d 247, 260; City of Rochester v Chiarella, 65 NY2d 92, 96; Gurnee v Aetna Life & Cas. Co., 55 NY2d 184, 192-193, cert denied 459 US 837; Hurd v City of Buffalo, 41 AD2d 402, supra; New York Pub. Interest Research Group v Steingut, 40 NY2d 250, 261). It is well established that "the courts should not act 'so as to cause disorder and confusion in public affairs even though there may be a strict legal right’ ” (Matter of Hellerstein v Assessor of Town of Islip, 37 NY2d 1, 13-14, quoting Matter of Andresen v Rice, 277 NY 271, 282 [declaring unconstitutional one of the oldest statutes and practices in the history of New York dating back to 1788]).
The recall practice has been in operation for over a century (see, 4 Lincoln, op. cit., at 499-501). Between 1932 and 1980 a total of 2,131 bills were recalled; while most bills are recalled only once, in 1939, 1963, 1966, 1968 and 1976 a single bill was recalled three times and in 1977 three bills were recalled three times (see, Zimmerman, op. cit., at 149-151; see also, Fisher and Devins, How Successfully Can the States’ Item Veto be Transferred to the President?, 75 Geo LJ 159, 182). Often a bill that has been recalled is never resubmitted to the Governor (see, Zimmerman, op. cit, at 150-151 [700 of the 2,131 bills recalled never resubmitted]). It is impossible to calculate how many, and which, bills would be affected by a ritualistic approach to the relief related to our declaration that the recall practice is not constitutionally authorized. In addition, despite the mitigation from the short four-month Statute of Limitations (CPLR 217), a retroactive ruling, or even a ruling *257 with resuscitative effect, in the instant case would cause profoundly uncertain effects in particular and unwarranted "disorder and confusion” (Matter of Hellerstein v Assessor of Town of Islip, 37 NY2d, at 14, supra).
Accordingly, the order of the Appellate Division should be reversed, with costs, and the bicameral recall practice should be declared unconstitutional prospectively from this date forward.