*222 OPINION OF THE COURT
Carolyn E. Demarest, J.
Petitioners in this hybrid CPLR article 78 proceeding/ declaratory judgment action are members of the New York State Unemployment Insurance Appeals Board (the Board), a five-member entity within the State Labor Department created originally by Laws of 1935 (ch 468, § 1) and continued, as modified, in Labor Law § 534. All three petitioners were appointed on December 29, 1994, to serve the balance of six-year terms which the prior incumbents had occupied as holdovers beyond the expiration of their original terms. Mr. Cappelli was designated Chairman. On that date, Governor Cuomo also appointed Arthur Strauss, who is not a party to this proceeding, to a term to expire November 18, 2000. Mr. Strauss was already a member of the Board but resigned his prior term, which was scheduled to expire on November 18,1996, to accept a new appointment to the same Board for a longer term. Petitioner Adams was appointed to Mr. Strauss’ prior term.
Petitioners duly executed and filed their oaths of office on December 29 and 30, 1994, pursuant to Public Officers Law § 30 and immediately commenced to perform the duties of their offices. However, notwithstanding that their services were accepted and their authority to act was de facto recognized, respondent Commissioner Sweeney and his interim predecessor, Acting Labor Commissioner Robert Gollnick, declined and/or failed to authorize processing of forms necessary to place petitioners on the payroll. As a consequence, on January 25, 1995, a regular State payroll day, petitioners were not paid. As no explanation was received in response to petitioners’ repeated attempts to communicate regarding the failure to pay them, on February 7, by order to show cause, petitioners initiated an article 78 proceeding seeking relief in the nature of mandamus directing respondent Commissioner to take those ministerial steps necessary to permit petitioners to receive their salaries and other benefits and injunctive relief precluding any interference with the continued performance of their duties. Petitioners’ verified petition further alleged that the failure to pay them constituted a taking in violation of the Fourteenth Amendment to the United States Constitution and illegal discrimination based on political affiliation in violation of their rights under the First and Fourteenth Amendments to the United States Constitution, which, in turn, also constituted a deprivation of civil rights in violation of 42 USC § 1983. This later contention is premised on the fact that Arthur Strauss, a *223 registered member of the Liberal Party, has been paid while petitioners, all registered Democrats, were not. Petitioners contend that respondents’ decision not to pay them was motivated by their political affiliation.
DISCUSSION
All parties agree that the ultimate disposition of petitioners’ suit rests upon the interpretation to be accorded New York Constitution, article V, § 4 and its application to Labor Law § 534. Respondents argue that the constitutional provision is clear on its face and expressly requires Senate confirmation of all members of all boards and commissions appointed to serve in the executive branch of the State government. As petitioners were not so confirmed, respondent contends their appointments are not valid.
It is undisputed that, since 1925, when article V, § 4 was enacted by the Legislature and ratified in referendum, there has not been a challenge to the validity of a gubernatorial appointment to a board or commission based upon the failure to obtain Senate confirmation under article V, § 4 where a statute did not expressly require such confirmation. In addition to the members of the Unemployment Insurance Appeal Board at issue here, there are numerous other appointments to various executive branch bodies which would also be invalidated if respondents’ interpretation of the constitutional provision prevails. (See, e.g., Executive Law § 242 [State Probation Commission]; ECL 27-1319 [State Superfund Management Board], 29-0301 [Commission for Siting Low-Level Radioactive Waste Disposal Facilities]; Mental Hygiene Law § 45.15 [Mental Hygiene Medical Review Board].) Moreover, it is also agreed that since the creation in 1935 of the Unemployment Insurance Appeal Board, no appointment to the Board has been submitted to the Senate for confirmation.
In creating the Board, the Legislature directed the appointment of three members by the Governor, the first appointments to be made "for terms of two, four and six years respectively, and thereafter as their terms expire the governor shall appoint or reappoint members for terms of six years. A member of an appeal board may be removed by the governor for cause, after a hearing. Vacancies shall be filled by appointment by the governor for the unexpired term.” (L 1935, ch 468, § 518 [6].) The statute was recodified in 1944, in substantially the same language except that the provision for staggered terms was eliminated, presumably as obsolete since the Board *224 had already been instituted with the desired configuration. (L 1944, ch 705, § 534.) In 1958 the Board membership was expanded to five and language was added to form the present statute insofar as it is relevant here. (L 1958, ch 977, § 1.) Section 534 of the Labor Law presently provides in relevant part: "The appeal board is hereby continued. Such board shall consist of five salaried members, not more than three of whom shall be adherents of the same political party. One of the members of the board shall be designated as chairman by the governor. The governor shall appoint or reappoint members for terms of six years. Vacancies shall be filled by appointment by the governor for the unexpired term. A member of the board may be removed by the governor for cause, after a hearing.” At no time has the statute provided for Senate confirmation of the Governor’s appointments to the Board.
Citing Matter of King v Cuomo (81 NY2d 247 [1993]) and Anderson v Regan (53 NY2d 356 [1981]), for the proposition that the plain language of a constitutional provision must be given effect, respondents argue that the plain and literal language of NY Constitution, article V, § 4 mandates Senate confirmation of all members of all boards and commissions, notwithstanding the long history of failure to confirm some members, including petitioners, and the absence of such provision in the governing statute.
New York Constitution, article V, § 4, as amended, reads: "The head of the department of audit and control shall be the comptroller and of the department of law, the attorney-general. The head of the department of education shall be The Regents of the University of the State of New York, who shall appoint and at pleasure remove a commissioner of education to be the chief administrative officer of the department. The head of the department of agriculture and markets shall be appointed in a manner to be prescribed by law. Except as otherwise provided in this constitution, the heads of all other departments and the members of all boards and commissions, excepting temporary commissions for special purposes, shall be appointed by the governor by and with the advice and consent of the senate and may be removed by the governor, in a manner to be prescribed by law.” Unlike the unequivocal constitutional limitation on appropriations at issue in Anderson (supra), or the bicameral recall practice found to be unconstitutional in Matter of King (supra) due to its absence from the constitutionally mandated procedure for enacting legislation, article V, § 4, though apparently specific in direction, is ambiguous in application when *225 viewed in the context of article V which provides for the organization of the executive branch. Under such circumstances, it is necessary to analyze the legislative history of the provision and historical practices in order to ascertain its intended purpose since the paramount rule of statutory construction is to give effect to the object, spirit and purpose of the enactment. (Ball v Allstate Ins. Co., 81 NY2d 22, 25 [1993]; Ginsberg v Purcell, 51 NY2d 272, 276 [1980]; cf., Matter of King v Cuomo, supra, at 253; Anderson v Regan, supra, at 358, 362; McKinney’s Cons Laws of NY, Book 1, Statutes §§ 94, 95, 96.) This rule applies as well in construing constitutional provisions. (Matter of Kolb v Holling, 285 NY 104, 112-113 [1941]; McKinney’s Cons Law of NY, Book 1, Statutes § 96.)
New York’s first Constitution, devised primarily by John Jay, Gouverneur Morris and Robert Livingston during the Constitutional Convention of 1777, provided for the separation of the powers of government into the executive, legislative and judicial branches, but, from the beginning, the distribution of power among these three branches has been the subject of debate. "While providing for the strongest executive among the States at the time, the Governor’s authority was circumscribed by the creation of the Council of Revision, composed of the Governor, Chancellor and the Justices of the Supreme Court, whose duty it was to veto or revise legislation deemed unconstitutional or improvident, and the Council of Appointment, consisting of the Governor and four Senators, whose function was to make appointments for all government offices in the State. Proposed by Jay as a compromise to ensure quality, it was expected that the Governor would nominate candidates for various positions and the Council would confirm or reject. (See, Galie, The New York State Constitution: A Reference Guide, at 2-4 [1991].) By 1801, the weakness of the Council of Appointment was revealed in a partisan dispute between a Federalist Governor Jay and Republican legislative members which resulted in the development of a notorious spoils system providing for the appointment of nearly 15,000 officers by 1820. (See, Galie, op. cit., at 6-7.)
The Constitutional Convention of 1821 abolished the Council of Appointment and established the power to appoint most of the "constitutional officers” in the Legislature. The new Constitution also vested in the local electorate control over the selection of thousands of previously appointed government officials. (Galie, op. cit, at 8-10.) This structure was advanced in the Convention of 1846 which provided for direct election of *226 most executive officers. (Galie, op. cit., at 12.) In 1872, a commission created by Governor Hoffman to study the Constitution recommended revision of article V to provide for gubernatorial appointment of all constitutional State officers other than the Comptroller so as to more fully vest in the Governor control over the administration of the executive branch. (New York State 1938 Constitutional Convention Committee Report, Problems Relating to Executive Administration and Powers [Poletti Report], at 123.) These recommendations were considered in the Convention of 1894, but not passed. Again in the 1915 Constitutional Convention, the reorganization of the departments of the executive branch was the focal point of discussion. Although the Constitution proposed to the electorate in 1915 did not pass, the language of current article V, § 4 derives from the Convention debates of 1915. The study of those debates is illuminating.
In January 1915, 152 "departments, bureaus, boards and commissions” constituted the executive branch, many with redundant and conflicting responsibilities, and each largely independent of supervision, except by the Governor personally. Such structure was unwieldy and wasteful. It was therefore proposed that the number of executive "departments” be limited to 17 and that all of the various existing "departments, bureaus, boards and commissions” be consolidated within one of those departments, under a designated "head.” Several "departments” were already functioning, having been created by earlier legislation, and were to be continued. Some of those "departments” were supervised, not by a single individual, but were governed by a board or commission; for example, the Board of Regents of the University of the State of New York supervised the Department of Education and multimember boards oversaw the Public Service and Civil Service Commissions. All "heads” of departments were designated "constitutional officers.” Proposed section 20 provided that "the heads of all departments and the members of all commissions unless otherwise provided for in this Constitution, shall be appointed by the Governor by and with the advice and consent of the Senate and may be removed by the Governor in his discretion.” The purpose of the proposed revision was to give the power to the Governor to efficiently execute the laws. (See, 3 Revised Record of 1915 Constitutional Convention, at 3328-3330.) A distinction was made among those officers or departments which had a long-established "peculiar relation” to the people, like the Attorney-General and the Comptroller, and *227 should, therefore, continue to be elected, and those boards or commissions, like Public Service, Education, Conservation and Civil Service, whose functions were quasi-legislative or quasi-judicial and not purely executive, for which a "board” or "commission” was an appropriate "head”, and all other departments deemed to be strictly executive which could be properly, supervised by a single person. Although some felt independent appointment and removal of this later group by the Governor was appropriate, the Convention concluded that such appointments should be subject to Senate advice and consent. "The heads of departments thus appointed constitute the group of advisers on whom the Governor must depend for carrying out the policies of his administration.” (Poletti Report, op. cit., at 126, quoting from Documents of 1915 Convention, op. cit., document No. 40, at 6-7.)
Under the 1915 Constitutional Plan, no new departments were to be created by the Legislature, but the Legislature was to provide for the internal organization of the departments. (See, Report of Reconstruction Commission on Retrenchment and Reorganization in the State Government, Oct. 10, 1919 [Moses Report], at 246.) While not approved by the electorate in 1915, the language and format of today’s section 4 of article V clearly originated in the 1915 debates. Those discussions indicate an intention to require Senate confirmation only of the "heads,” be they single individuals or the members of boards or commissions, of the 17 proposed constitutional departments, unless the method of selection was otherwise expressly provided in the Constitution. Such interpretation is further borne out in subsequent legislative history.
In response to the same concerns expressed in the Convention of 1915, upon his election, Governor Alfred E. Smith appointed a Reconstruction Commission, chaired by Robert Moses, to formulate a "Plan of Retrenchment.” The report of the Commission, rendered in 1919, recommended many of the changes proposed in 1915, including consolidation of the numerous agencies, as well as the establishment of an executive budget system to replace the previously uncoordinated, separate funding of the agencies. By this time, the government had grown to "a miscellaneous collection of 187 offices, boards, commissions and other agencies * * * independent of one another and most * * * subject to no direct and effective supervision by a superior authority.” (Moses Report, op. cit., at 6.) At that time, new agencies and boards were created by the Legislature haphazardly without regard to any existing *228 structure. Many agency heads had terms extending beyond that of the Governor, thus limiting the Governor’s control.
A plan was proposed recommending consolidation of all administrative agencies into 16 identified departments, "each headed by a single officer, except departments where quasi-legislative and quasi-judicial or inspectional and advisory functions require a board,” to be chosen by the Governor, subject to Senate confirmation, except for the Comptroller who was to continue to be elected; extension of the Governor’s term of office from two to four years and the adjustment of the terms of executive officers to the same term as that of the Governor; the grouping of related functions within each department into "divisions and bureaus” with an accountable chief; and a budget system under which the Governor and his "Cabinet” would submit yearly proposals for the raising and spending of all State monies. (Moses Report, op. cit., at 11.)
The Moses Commission Report contained an elaborate and detailed scheme for each enumerated department, including the Department of Labor which was to continue to be headed by an Industrial Commission of five members to be appointed by the Governor with Senate consent, for terms of five years. The Commission would appoint a Director who would be responsible for over-all administration of the entire department and would serve "during good behavior.” The Reconstruction Plan specifically provided for seven "Bureaus” or subdivisions of the Department of Labor, the heads of which were to be in the competitive class under civil service, except for the Secretary, meant to be a general administrator, who was to be also appointed by the Commission. At the time, no provision for unemployment insurance existed, however, both the existing State Insurance Fund and Bureau of Workmen’s Compensation were placed under the supervision of the Director. The Plan specified that administration of any new bureaus would be under the Director and "not in independent new departments.” (See, Moses Report, op. cit., at 125-128.) Implementation of the recommended Plan, according to the Moses Commission, required "only statutory changes,” notwithstanding the language of their proposed constitutional amendment to article V, § 5, virtually identical to section 4 at the time of its adoption in 1925: "§ 5. The heads of all the departments and the members of all boards, commissions and councils mentioned in this article shall, unless otherwise provided in this Constitution, be appointed by the Governor by and with the advice and consent of the Senate and may be removed by him in his discre *229 tion.” (Moses Report, op. cit., at 398.) It is clear from the details of the Plan itself and the extensive discussions which preceded it, both in the 1915 Constitutional Convention and in the Moses Report, that the intent was not to require Senate confirmation of each and every member of every subordinate bureau, board or commission within the departments, but that only those deemed members of the Governor’s "Cabinet,” "heads of Departments” as provided in the Constitution, were to require such confirmation.
As a result of Governor Smith’s defeat in 1920, the proposals of the Reconstruction Commission were deferred until the 1923 Legislative Session, following Governor Smith’s re-election. With some modification, such as the continued election of the Attorney-General as well as the Comptroller and minor changes in the number and names of the designated civil departments, the substance of the amendment to article V tracked the Moses Commission’s Proposal. The precise language of section 4, as passed in 1923 and 1925 and ratified in the election of 1925, is as that section appears today except for the modifying phrase following "the heads of all other departments and the members of all boards and commissions,” "mentioned in this article, ” which was deleted in 1938. (L 1923, Concurrent Resolutions, proposed Amendments to NY Const, at 1760; L 1925, Concurrent Resolutions, proposed Amendments to NY Const, at 1149.) Both petitioners and respondents suggest that this modification was insignificant, relying upon the only mention of the change at the 1938 Constitutional Convention by Mr. Feinberg: "There was nothing done to Section 4 except a couple of words were struck out as being unnecessary.” (3 Revised Record of 1938 Constitutional Convention, at 2367.) It is noted that Mr. Moses, whose Reconstruction Commission had drafted the original language of section 4, was also a participant in the 1938 Convention. This court infers that the reason the phrase "mentioned in this article” was no longer necessary in 1938 is because the various "boards and commissions” which it modified referred to those 187 boards, commissions, and bureaus existing prior to the restructuring which, by 1938, had been merged into the 20 named departments. Such inference is suggested as well by the simultaneous deletion of transition provisions contained in section 3 of article V.
The 1925 amendments to article V included a much more extensive section 3 than appears in the present Constitution. Section 3, as enacted, directed: "§ 3. At the session im *230 mediately following the adoption of this article the legislature shall provide by law for the appropriate assignment, to take effect not earlier than the first day of July, one thousand nine hundred and twenty-six, of all the civil, administrative and executive functions of the state government, to the several departments in this article provided. Subject to the limitations contained in this constitution, the legislature may from time to time assign by law new powers and functions to departments, officers, boards or commissions continued or created under this constitution, and increase, modify or diminish their powers and functions * * * The elective state officers in office at the time this article as amended takes effect shall continue in office until the end of the terms for which they were elected. Pending the assignment of the civil, administrative and executive functions by the legislature pursuant to the directions of this section, the powers and duties of the several departments, boards, commissions and officers now existing are continued. Subject to the power of the legislature to reduce the number of officers, when the powers and duties of any existing office are assigned to any department, the officers exercising such power shall continue in office in such department, and their term of office shall not be shortened by such assignment.” (L 1923, Concurrent Resolutions, proposed Amendments to NY Const, at 1148-1149.) It is clear that the boards and commissions "mentioned in this article” included those diverse executive entities which preceded the new structure. It is also clear that the amendment left to the Legislature the responsibility to devise the precise details of the new scheme. While the critical language of section 4 is framed in the conjunctive, "the heads of all other departments and the members of all boards and commissions”, thus rendering the provision susceptible of the interpretation urged by respondents, from the expressed purpose and history of the restructuring process, this court infers that the use of the conjunctive "and” was merely unfortunate verbiage, since the obvious intent was that such "boards and commissions” were also to be "heads of departments.” At the time of enactment, it was expected that the Legislature might continue some of those "boards and commissions” which were already supervising various executive agencies. If such a board or commission was continued as the "head” of a department, its members would require Senate confirmation. Had the actual intent of the framers been to require Senate confirmation of each and every member of every subsidiary board or commission within the 20 permanent departments, *231 surely the legislation which followed and implemented the new structure would have so provided.
On November 19, 1925, the State Reorganization Commission, chaired by Charles E. Hughes, convened, pursuant to legislative direction under section 3. Its report, dated February 26, 1926 (Hughes Report), recommended that the Department of Charities be headed by a "State Board of Charities” and that Civil Service be headed by a commission. Except for these two and Education, which, as provided in the Constitution, was to be headed by the Regents, and Agriculture and Markets, the Report recommended that all other department heads be "individuals and not boards or commissions” (Hughes Report, op. cit., at 5). The Hughes Commission, acting immediately following the ratification of the new amendment and pursuant to its direction, interpreted article V, § 4 to require only that the heads of departments, be they individuals or members of boards or commissions, be subject to Senate confirmation following appointment by the Governor. This is borne out in the extensive and detailed scheme set forth for each of the 20 designated civil departments, all of which contained subsidiary divisions with various provisions made for the designation of a chief officer or supervisory body.
The Department of Labor, originally created in 1909, was to be continued as was, with the State Industrial Commissioner as head and seven subsidiary bureaus. The Industrial Commissioner would continue to be served, in an advisory capacity, by an Industrial Council of 10 members and an Industrial Board, composed of three members appointed by the Governor without Senate confirmation for terms of six years, to develop an industrial code and oversee workmen’s compensation claims. An Advisory Committee of Policyholders, appointed by the Governor, advised the Industrial Commissioner regarding administration of the State Insurance Fund. The Hughes Commission recommended expansion of the Industrial Board to five members and specified that "the members of this board and of the Industrial Council shall continue to be appointed as at present by the Governor.” (Hughes Report, op. cit., at 48.) Given their proximity in time to the actual passage of the amendment, and the fact that they were acting at the direction of the same legislators who had passed it, it is difficult to imagine that the Hughes Commission would have so misperceived the intent of the very provision they were implementing as to expressly omit the need for Senate confirmation of the members of the many subsidiary boards and commissions described in their report.
*232 Despite the fact that the constitutional language at issue might superficially suggest the construction advocated by respondents, it also seems unlikely, given the clear intention in modifying the organization of the executive branch to bring greater economy and efficiency to government and confer greater power and, concomitantly, greater accountability upon the Governor, that the requirement for Senate confirmation was meant to extend to every member of every board or commission, particularly in light of the earlier experience in 1801 when political conflict between Governor and Senators of opposing parties had generated excessive numbers of unnecessary government positions. Moreover, the extensive analysis of the existing structure and functions of the departments of the executive branch contained in the Poletti Report (op. cit., at 132-145) for the Constitutional Convention of 1938 reveals a myriad of various boards and commissions, some requiring Senate confirmation and some appointed exclusively by the Governor according to legislative direction. Interestingly, the Department of Labor included the most numerous subsidiary boards with various methods of appointment of members as provided by statute. Such diversity belies the suggestion that article V, § 4 mandated Senate confirmation of all members.
In Matter of Kolb v Holling (285 NY 104, supra), the Court of Appeals recognized the importance of legislative history in divining the true intent of constitutional and statutory language. Noting the particular significance of legislative action following immediately upon the heels of constitutional revision, and quoting from People ex rel. Joyce v Brundage (78 NY 403, 406 [1879]), the Court noted (285 NY, at 112-113): "The weight to be given to contemporaneous construction is well expressed by Marcy, J., in People v. Green (2 Wend. 274). He says: 'Great deference is certainly due to a legislative exposition of a constitutional provision, and especially when it is made almost contemporaneously with such provision, and may be supposed to result from the same views of policy, and modes of reasoning which prevailed among the framers of the instrument propounded.’ ” The Legislature that acted upon the recommendations of the Hughes Commission was the very same Legislature that had passed the amendments to article V. The legislation it passed implementing the mandate of sections 3 and 4 is strong evidence of the proper interpretation to be accorded these sections. Taken together with the fact that for 60 years members of the Unemployment Insurance Appeal Board have never been confirmed by the Senate, the failure to *233 provide for such confirmation in the legislation must be deemed deliberate. There is nothing in the entire legislative history of article V, § 4 to suggest that such omission was meant to be supplied with reference to constitutional mandate. The totality of the historical analysis leads this court to conclude that article V, § 4 applies only to the "heads” of the departments and not to subsidiary boards or commissions. Having so concluded, it is not further disputed that petitioners are the lawful occupants of their respective positions entitled to complete their designed terms of office.
THE 1983 CLAIM
Having determined that effective December 30, 1994, petitioners became the lawful incumbents of their offices, it is necessary to consider whether the respondents’ failure to pay them in a timely fashion constituted a violation of their constitutional and civil rights giving rise to a claim pursuant to 42 USC § 1983.
As agreed between the parties, all facts will be accepted as presented in the papers. No testimony has been taken and the court makes no assessment of credibility other than as suggested by the undisputed facts. The court accepts, as it must, the assertion by respondent Sweeney that he was unaware of petitioners’ political affiliation prior to commencement of this proceeding and that his failure to place them on the payroll was solely at the direction of respondent Pataki. The court further accepts the representation that all members of the Board were treated similarly: that pursuant to the Governor’s direction, no action was taken with respect to any of them. Mr. Strauss’ dissimilar treatment (and apparently that of the other Liberal Party member of the Board, Mr. Segedy) was merely the result of his status quo presence on the Board payroll prior to the December reappointment. To determine whether a section 1983 action lies, it is necessary to examine the motives of Governor Pataki and the nature of petitioners’ offices.
Petitioners cite to various statements purportedly made to the press both by respondent Sweeney prior to commencement of litigation and by Governor Pataki after petitioners had begun legal action as evidence that they were targeted by the newly elected Governor for political reasons. There is no refutation of this suggestion from respondent Pataki and, indeed, it is obvious that Governor Pataki’s political ire was piqued by Governor Cuomo’s equally political decision to fill three potential patronage positions with Democratic Party members *234 on the eve of his departure from office. Such reality hardly shocks; it is probable that the incumbent "appointing authority” will take similar action in the waning days of his own tenure, whether that be in 4 or 20 years, if he is to be succeeded by an administration of an opposing party.
Petitioners have been performing the duties of their offices, without interference from respondents, since December. There has never been any suggestion that their performance was inadequate or that the Governor had cause for their discharge. Respondents have acknowledged petitioners’ right to compensation. The failure to pay them was quite obviously intended to induce their departure from office, thereby making their positions available to other appointees.* Thus, although never given notice of dismissal or advised to cease the performance of the duties of their offices, petitioners were constructively discharged by the actions of respondents. Respondents’ legal challenge based on the lack of Senate confirmation, while certainly not frivolous in light of the extensive foregoing analysis, appears, nonetheless, to be somewhat disingenuous given respondent Pataki’s own appointments made without Senate confirmation. As noted by petitioners and not factually disputed, Governor Pataki appointed Joseph Holland Commissioner of Housing and Community Renewal on January 1 pursuant to Public Housing Law § 11 and Patricia A. Woodworth Chair of the Public Authorities Control Board on January 6 pursuant to Public Authorities Law § 50. The cited statutes provide for gubernatorial appointment of the head of a subsidiary executive agency without Senate confirmation. From the totality of the undisputed facts, this court infers that the only reason for respondents’ failure to place petitioners on the payroll was a politically motivated hope that the lack of compensation would drive them from office, thereby creating opportunities for Governor Pataki’s own appointees.
In Elrod v Burns (427 US 347 [1976]), Justice Brennan provided a thorough analysis of the evils of unrestrained political patronage and its necessarily unconstitutional impact upon the most fundamental of First Amendment rights, concluding *235 that the respondent noncivil service employees of the Cook County Sheriffs Office, which had been or were threatened to be discharged based exclusively on their lack of political support from the newly elected democratic Sheriff, had stated a cause of action under 42 USC § 1983. The Court held unequivocally "that the practice of patronage dismissals is unconstitutional under the First and Fourteenth Amendments” (supra, at 373), but did exempt from the constitutional prohibition those positions found to be "policymaking” based upon the nature and extent of the individual’s responsibilities and "whether the employee acts as an advisor or formulates plans for the implementation of broad goals” (supra, at 367-368). Four years later, in Branti v Finkel (445 US 507 [1980]), this test was applied to determine that Rockland County Assistant Public Defenders who were satisfactorily performing their duties could not be discharged solely for political reasons. Whether petitioners fall within the purview of First Amendment protection requires examination of their duties.
The Unemployment Insurance Fund, designed to provide financial relief to persons involuntarily unemployed, is administered, as part of the Department of Labor, by the Commissioner, who makes all rules and regulations and, subject to civil service, appoints those officers and employees necessary to the administration of the law. (Labor Law § 530.) An elaborate scheme of eligibility and benefits, set forth in sections 511 through 527, is initially interpreted and applied by the Commissioner who authorizes or denies the payment of claims. The Commissioner also appoints Referees, who are under the supervision and administrative control of the Appeal Board, to hear and decide disputes. (Labor Law § 535.) It is the function of the members of the Appeal Board, acting in their quasi-judicial capacity, to finally determine any disputed claims and to maintain an index of authority for its decisions. (Labor Law § 534.) The Board’s construction and application of the statute is controlling over that of the Commissioner and must be accepted by the courts if it has a rational basis in law and support in the record. (Matter of Marsh, 13 NY2d 235, 239 [1963].) It is apparent that petitioners, unlike those in Elrod and Branti (supra), are high-level policymakers not generally protected from patronage discharge under the constraints of the First and Fourteenth Amendments.
However, Labor Law § 534 itself appears designed to insulate the Board from the vicissitudes of elective politics by providing for staggered terms of six years so that no particular Governor
*236 would have the opportunity to unilaterally appoint the membership of the entire Board within a single term of four years. Nor may a member be removed except for cause following a hearing. Further, the statute as amended in 1958 prescribes that not more than three of the five members "shall be adherents of the same political party.” Nowhere in the legislative history is the purpose of this amendment articulated. It is reasonable to infer, however, that the Legislature intended to create political balance within this highly autonomous body charged with substantial authority to set labor policy for the State of New York. (Cf., Hering v Hill, 814 F Supp 356, 358 [SD NY 1993].) Thus, party adherence becomes an essential and legitimate job qualification. (See, Branti v Finkel, supra, 445 US, at 518.)
In Kaluczky v City of White Plains (57 F3d 202 [2d Cir]), the United States Court of Appeals for the Second Circuit determined that a six-year term of office, while insulating a personnel officer from outright discharge, did not alter his policymaking role or insulate him from defendants’ efforts to induce his resignation so that another, more politically desirable, could be appointed. The court found that the six-year tenure did not afford plaintiff additional First Amendment protection if the criteria for the "policymaker exception” was established. That criteria include whether a position is covered by civil service, given policymaking and independent decision-making functions by law, requires technical competence, has the power to control others, is perceived publicly as authority on matters of policy, has a nexus or contact with elected officials or political leaders, receives a high salary. (Vezzetti v Pellegrini, 22 F3d 483, 486 [2d Cir 1994]; Regan v Boogertman, 984 F2d 577, 580 [2d Cir 1993]; Savage v Gorski, 850 F2d 64, 68-69 [2d Cir 1988]; Kaluczky v City of White Plains, supra, at 208-209.) Where the appointing authority is able to demonstrate that party affiliation is an appropriate requirement of a policymaking position, patronage dismissals and comparable adverse employment practices are not proscribed by the First Amendment and individuals occupying such positions will not be protected. As noted in Rutan v Republican Party of III. (497 US 62, 76 [1990]): "[t]he First Amendment is not a tenure provision, protecting public employees from actual or constructive discharge.”
There is obvious tension between the statutory scheme for unilateral gubernatorial appointment of members of the Board who may not all be of the same party, thus on some occasions requiring a Chief Executive to affirmatively seek out a *237 member of a different political party, and the extensive authority vested in the Board to determine labor policy for the State of New York. In fact, this scheme suggests that Senate confirmation of candidates might well be an appropriate element of selection, notwithstanding this court’s determination that such confirmation is not required. It is clear, however, that on January 1, 1995, the date upon which respondent Pataki assumed office, the petitioners were duly appointed, lawful incumbents of their offices entitled to remain for the duration of their respective terms. They had already undertaken to perform their duties and have continued to do so without interference or criticism throughout this suit. The only issue has been respondents’ apparently deliberate and willful decision not to pay them for their services until forced to do so by court order. Although this court finds, given the nature of the duties of petitioners, the mechanism for their direct appointment by the Governor, and their obvious status as high-level policymakers within the executive branch, that they are not protected from political discharge or other adverse employment conditions by the First Amendment, it is well established that a State job and the right to "regular paychecks, health insurance and other benefits” is a valuable property interest (Rutan v Republican Party of Ill., supra, at 77) for which the Fourteenth Amendment provides due process protection. (Board of Regents v Roth, 408 US 564 [1972]; O’Neill v City of Auburn, 23 F3d 685, 688 [2d Cir 1994].) By virtue of their clear entitlement under Labor Law § 534 not to be removed except for cause following hearing, petitioners’ rights under the Fourteenth Amendment to be afforded notice and an opportunity to be heard before being deprived of property to which they were lawfully entitled, i.e., their salaries and benefits, were violated. Thus, petitioners have stated a cause of action pursuant to 42 USC § 1983. (See, Ohland v City of Montpelier, 467 F Supp 324 [D Vt 1979]; Hewlett-Woodmere Pub. Lib. v Rothman, 108 Misc 2d 715 [Dist Ct, Nassau County 1981].)
Petitioners do not seek civil damages for the violation of their Fourteenth Amendment rights. Whether respondents enjoy qualified immunity for their actions need not therefore be determined, however, it was clearly within respondents’ ken, in light of New York Constitution, article I, § 6 and the language of Labor Law § 534, that their refusal to pay petitioners while accepting their services violated petitioners’ well-established civil and constitutional rights. (Cf., Hodge v Jones, *238 31 F3d 157, 169 [4th Cir 1994] [Powell, J., concurring].) Given the particularly egregious conduct of respondents in forcing petitioners to resort to legal action in order to secure their right to compensation, thereby incurring considerable expense in legal fees, this court finds petitioners are entitled to be awarded legal fees pursuant to 42 USC § 1988. (See, Ortiz v Regan, 980 F2d 138 [2d Cir 1992].)
CONCLUSION
Upon the foregoing analysis, New York Constitution, article V, § 4 does not require Senate confirmation of appointments to the Unemployment Insurance Appeal Board and petitioners are declared to be lawful members of that Board for the balance of their respective terms. Respondents are hereby enjoined from further interference in the performance of petitioners’ duties or from removing them from the payroll without notice of cause and an opportunity to be heard. This court further finds that respondents’ willful failure to provide compensation to which petitioners were entitled, in an effort to force them from office, constituted a violation of petitioners’ rights to due process pursuant to the Fourteenth Amendment to the United States Constitution, thereby depriving them, under color of State law, of rights, privileges and immunities secured by the Constitution in violation of 42 USC § 1983. Accordingly, petitioners are awarded costs and reasonable attorneys’ fees pursuant to 42 USC § 1988, to be assessed upon hearing.

 Respondents have withdrawn their initial contention that a "hiring freeze” required the deferment of petitioners’ compensation. The tenability of such argument is belied, however, by the fact that pursuant to Public Officers Law §§ 5 and 39, the only way to remove petitioners, other than for cause, would be by appointing a successor. (See, Matter of Riester v Reilly, 138 Misc 2d 68 [Sup Ct, Albany County 1988].) The only other alternative would require abolition of their positions, which the Governor was without power to do since the positions are statutory.