EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Hon. Aníbal Acevedo Vilá, Gobernador del Estado Libre Asociado de Puerto Rico<br><br>Hon. José Luis Dalmau Santiago, Senador del Distrito de Humacao<br><br>    Demandantes<br><br>        vs.<br><br>Hon. José F. Aponte Hernández, Presidente de la Cámara de Representantes<br><br>José Enrique Meléndez Ortiz, Secretario de la Cámara de Representantes<br><br>Hon. Kenneth McClintock Hernández, Presidente del Senado y<br><br>Senado de Puerto Rico, por conducto de su Presidente, Hon. Kenneth McClintock Hernández<br><br>        Demandados | Apelación<br><br>2006 TSPR 115<br><br>168 DPR \_\_\_\_ |

Número del Caso: MD-2006-6

Fecha: 3 de julio de 2006

Oficina del Procurador General:

                    Lcda. Sarah Y. Rosado Morales
                    Procuradora General Auxiliar

                    Lcdo. Salvador J. Antonetti Sttutts
                    Procurador General


Abogado de los Interventores:

                    Lcdo. Eudaldo Baez-Galib

Abogados de la Parte Demandada:

                    Lcdo. Angel J. Vargas Carcaña
                    Lcdo. Kevin Miguel Rivera-Medina
                    Lcdo. Richard W. Markus
                    Lcdo. Manuel D. Herrero
                    Lcdo. Carlos E. Pérez Acosta


Banco Gubernamental de Fomento:

                    Lcda. Heidi L. Rodríguez Benítez
                    Lcda. Sara L. Vélez Santiago

Materia: Mandamus

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Hon. Aníbal Acevedo Vilá,              *
Gobernador del Estado Libre Asociado   *
de Puerto Rico                         *
                                       *
Hon. José Luis Dalmau Santiago,        *
Senador del Distrito de Humacao        *
                                       *
   Demandantes                         *
                                       *
      vs.                          *
                                       * MD-2006-06
Hon. José F. Aponte Hernández,         *
Presidente de la Cámara de             *
Representantes                         *
                                       * Mandamus
José Enrique Meléndez Ortiz,           *
Secretario de la Cámara de             *
Representantes                         *
                                       *
Hon. Kenneth McClintock Hernández,     *
Presidente del Senado y                *
                                       *
Senado de Puerto Rico, por conducto    *
de su Presidente,
Hon. Kenneth McClintock Hernández      *
                                       *
   Demandados                          *
                                       *
***************************************

Opinión del Tribunal emitida por el Juez Presidente señor Hernández Denton

San Juan, Puerto Rico a 3 de julio de 2006.

Mediante esta petición de *mandamus*, en jurisdicción original, comparecen ante nos el Gobernador del Estado Libre Asociado de Puerto Rico, Hon. Aníbal Acevedo Vilá, y el Senador por el Distrito de Humacao, Hon. José Luis Dalmau Santiago. Nos solicitan que ordenemos al Presidente de la Cámara de Representantes, Hon. José F. Aponte Hernández, y al Secretario de dicho cuerpo

legislativo, Lcdo. José Meléndez Ortiz, a que sometan a la consideración del Primer Ejecutivo el Proyecto Sustitutivo al P. de la C. 2193, el cual contiene el texto de la "Ley de la Justicia Contributiva de 2006", según fue aprobada por la Asamblea Legislativa, para que éste pueda ejercer su derecho constitucional de aprobar o vetar la referida pieza legislativa.

En vista de que la Sección 19 del Artículo III de la Constitución del Estado Libre Asociado de Puerto Rico, 1 L.P.R.A., claramente dispone que un proyecto de ley que es aprobado por ambas cámaras se someterá al Gobernador, se expide el auto de *mandamus*. Por ende, se ordena a los demandados cumplir con su deber ministerial constitucional de someter el citado proyecto de ley a la atención del Gobernador.

I.

Los hechos que suscitaron este pleito no están en controversia. El 21 de junio de 2006, la Cámara de Representantes del Estado Libre Asociado de Puerto Rico aprobó el Proyecto Sustitutivo al P. de la C. 2193 con treinta y un (31) votos a favor y dieciocho (18) votos en contra. El aludido proyecto consignaba la versión de la Cámara de Representantes sobre la denominada "Ley de la Justicia Contributiva de 2006".

Una vez dicho proyecto fue debidamente aprobado por la Cámara, el 21 de junio, pasó a la consideración del

Senado de Puerto Rico. El 25 de junio de 2006, una mayoría de los miembros del Senado aprobó el proyecto sin realizarle enmienda alguna. Además, se dispuso que la medida fuera enrolada y entregada a la Oficina de Actas y Récords de la Cámara de Representantes.

Posteriormente, se desató un debate entre la Cámara de Representantes, el Senado y el Gobernador con relación al significado de ciertas disposiciones del proyecto aprobado. Como consecuencia de esto, el 27 de junio de 2006, la Cámara de Representantes convocó una sesión y aprobó el "Sustitutivo al Proyecto Cameral 2193 de Reforma Contributiva". Mediante dicha actuación, el cuerpo reconsideró y enmendó ciertas disposiciones de la Ley de Justicia Contributiva de 2006 relacionadas con el monto de las tasas de impuesto al consumo. El 28 de junio de 2006, la Oficina de Actas y Récords de la Cámara de Representantes remitió al Senado una comunicación informando la reconsideración de la medida, pero este último cuerpo no la recibió. Tampoco consintió a que se devolviera el proyecto a la Cámara para su reconsideración.

Como el proyecto originalmente aprobado por ambos cuerpos no había sido remitido a su atención, el 28 de junio de 2006, el Gobernador cursó sendas misivas al Hon. José F. Aponte Hernández y al Lcdo. José E. Meléndez Ortiz para requerirles que cumplieran con sus deberes

ministeriales de certificar y someter la pieza legislativa a su consideración.

En vista de que ambos funcionarios no accedieron a lo solicitado, el Gobernador y el Hon. José Luis Dalmau Santiago acuden ante nos mediante este recurso de *mandamus*.[1] Sostienen, esencialmente, que en atención a la Sección 19 del Artículo III de la Constitución del Estado Libre Asociado de Puerto Rico, 1 L.P.R.A., una vez el proyecto de ley es debidamente aprobado tanto por la Cámara como por el Senado, los presidentes de ambos cuerpos tienen un deber ministerial de someter la medida ante la consideración del Gobernador. Conforme a este fundamento, solicitan que le ordenemos al Hon. José F. Aponte Hernández y al licenciado Meléndez Ortiz a enrolar, firmar y certificar el proyecto de ley aprobado por la Asamblea Legislativa y a someterlo ante la consideración del Primer Ejecutivo para que lo apruebe mediante su firma o lo vete conforme a sus prerrogativas constitucionales.

La petición formulada fue acompañada por una "Moción en Auxilio de Jurisdicción". En ésta, nos solicitan que atendamos el recurso con carácter prioritario. Esto debido a que algunas disposiciones del proyecto de ley en

---

[1] La petición de autos, igualmente, va dirigida contra el Senado y su Presidente, Hon. Kenneth McClintock Hernández, bajo el fundamento de que éstos son partes indispensables para la configuración del remedio solicitado. *Véase* Petición de *Mandamus*, págs. 6-7.

controversia entrarían en vigor el 1ro de julio de 2006, de ser aprobada dicha medida por el Gobernador. Vista la petición, concedimos un término simultáneo e improrrogable al Presidente, al Secretario de la Cámara de Representantes y al Presidente del Senado para que expresaran sus posiciones en torno a este recurso.

En cumplimiento con lo ordenado, el Senado de Puerto Rico, por conducto de su Presidente, Hon. Kenneth McClintock Hernández, comparece ante nos allanándose al remedio solicitado por el Gobernador en su petición de *mandamus.* Señala, además, que está en la disposición de firmar y enviar al mandatario el Proyecto Sustitutivo del P. de la C. 2193, una vez los funcionarios de la Cámara de Representantes cumplan con su deber ministerial de completar el trámite de enrolado y firmar el texto certificado, según aprobado por la Cámara de Representantes en su Sesión Ordinaria de 21 de junio de 2006 y según aprobado, sin enmiendas, por el Senado de Puerto Rico en su Sesión Ordinaria de 25 de junio de 2006.

De igual forma, compareció ante nos el Presidente de la Cámara, Hon. José F. Aponte Hernández. En esencia, sostiene que la petición de *mandamus* presentada por el Gobernador no cumple con los requisitos establecidos por este Tribunal para la expedición de este auto en jurisdicción original. Igualmente, aduce que los demandantes carecen de legitimación activa para impugnar

la determinación de la Cámara de Representantes de Puerto Rico, que la controversia no está madura y que este pleito no es justiciable, debido a que el Gobernador pretende socavar la voluntad y las prerrogativas de los miembros de la Cámara de Representantes sobre el gobierno interno del cuerpo y el trámite legislativo de las medidas.

Comparecen además, el Banco Gubernamental de Fomento mediante una petición de autorización para comparecer como *amicus curiae* y siete miembros del Senado de Puerto Rico con una petición de mandamus y solicitud de intervención. La disposición del recurso mediante esta Opinión hace innecesario expresarnos sobre dichos escritos.

Con el beneficio de las comparecencias,[2] y en consideración al alto interés público que ha suscitado esta controversia, procedemos a resolver la controversia de autos con la premura que este asunto amerita.

II.

Al resolver este caso, partimos de la premisa de que vivimos en un ordenamiento constitucional donde impera la ley y no las voluntades individuales. Los que tenemos el

---

[2] Comparecen además, el Banco Gubernamental de Fomento mediante una petición de autorización para comparecer como *amicus curie* y siete miembros del Senado de Puerto Rico con una petición de mandamus y solicitud de intervención. La disposición del recurso mediante esta Opinión hace innecesario expresarnos sobre dichos escritos.

privilegio de servir a nuestro país hemos jurado ser fieles al mandato constitucional.[3] A este Tribunal le corresponde la ineludible obligación de asegurar la estabilidad constitucional del país y la seguridad jurídica de sus instituciones democráticas, particularmente en momentos en que los otros poderes constitucionales están en un conflicto que amenaza la estabilidad económica, y la salud fiscal y crediticia del país.

## A.

Como cuestión de umbral, pasemos a examinar si estamos ante una controversia susceptible de un remedio judicial, en vista del criterio de la justiciabilidad. Como hemos resuelto en el pasado, entre otros, un caso no es justiciable cuando las partes demandantes no poseen legitimación activa para incoar un recurso judicial

---

[3] La Sección 16 del Artículo VI de nuestra Constitución dispone:

> Todos los funcionarios y empleados del Estado Libre Asociado, sus agencias, instrumentalidades y subdivisiones políticas prestarán, antes de asumir las funciones de sus cargos, juramento de fidelidad a la Constitución de los Estados Unidos de América y a la Constitución y a las leyes del Estado Libre Asociado de Puerto Rico.

determinado. _Acevedo Vilá v. Meléndez Ortiz_, res. el 7 de junio de 2005, 2005 TSPR 79.

La legitimación activa nos asegura que el promovente de una acción posea un interés "de tal índole que, con toda probabilidad, habrá de proseguir su causa de acción vigorosamente y habrá de traer a la atención del tribunal las cuestiones en controversia". _Noriega v. Hernández Colón_, 135 D.P.R. 406, 427 (1994); _Hernández Agosto v. Romero Barceló_, 112 D.P.R. 407, 413 (1982). Para cumplir con dicho objetivo, el demandante debe demostrar que: (1) ha sufrido un daño claro y palpable; (2) el daño es real, inmediato y preciso, no abstracto o hipotético; (3) existe una relación causal razonable entre la acción que se ejecuta y el daño alegado y (4) la causa de acción surge al amparo de la Constitución o de alguna ley. _Acevedo Vilá v. Meléndez Ortiz_, _supra_; _P.P.D. v. Gobernador I_, 139 D.P.R. 643 (1995).

El Gobernador del Estado Libre Asociado de Puerto Rico tiene legitimación activa para acudir al proceso judicial a vindicar sus prerrogativas constitucionales siempre que concurran los requisitos mencionados. _Acevedo Vilá v. Meléndez Ortiz_, _supra_. De igual manera, igual exigencia se imprime cuando se trata de los cuerpos legislativos o cada uno de sus miembros. _Hernández Agosto v. Romero Barceló_, _supra._ Un legislador tendrá legitimación activa para cuestionar cualquier regla o

proceso que coarte sus facultades constitucionales, <u>Silva v. Hernández Agosto</u>, 118 D.P.R. 45 (1986). También tendrá legitimación activa para impugnar la constitucionalidad de una ley o actuación gubernamental cuando se vea afectado directamente en su carácter personal. <u>Noriega v. Gobernador</u>, 122 D.P.R. 650 (1988). Claro está, el representante o senador no podrá acudir al tribunal para trasladar a éste su fallido debate legislativo. <u>Hernández Torres v. Hernández Colón</u>, 131 D.P.R. 593, 604 (1992). Es decir, si el legislador puede o pudo haber obtenido un remedio de sus compañeros mediante el proceso legislativo, los tribunales no intervendrán en el asunto. *Véase* L. Tribe, *American Constitutional Law*, 3rd ed., Vol. I, 2000, Sec. 3-20, pág. 463.

## B.

En el caso de autos, comparece el Hon. Aníbal Acevedo Vilá en su capacidad de Gobernador del Estado Libre Asociado de Puerto Rico. Sostiene que posee el derecho constitucional de sancionar o vetar los proyectos de ley tan pronto éstos se aprueban por ambos cuerpos de la Asamblea Legislativa. Alega, además, que ha sufrido un daño claro y palpable al impedírsele ejercer dicha prerrogativa constitucional, toda vez que el Presidente y el Secretario de la Cámara de Representantes no han sometido el proyecto a su consideración, aun cuando fue aprobado por la mayoría de los miembros de ambos cuerpos legislativos. Petición de *Mandamus*, pág. 9.

Evaluadas sus alegaciones a la luz de nuestra normativa constitucional y de los criterios específicos antes expuestos, entendemos que el Gobernador de Puerto Rico tiene legitimación activa para presentar este recurso.

En estas circunstancias, no es necesario pronunciarnos sobre la legitimación activa del codemandante, Hon. José Luis Dalmau Santiago, ni de los otros Senadores que solicitan intervenir en este recurso.

Resuelto este criterio de umbral, pasemos a considerar si el recurso de *mandamus* es el adecuado para atender la controversia aquí presente.

III.

A.

El recurso de *mandamus* es aquel que se expide para ordenar a una persona o personas naturales, a una corporación o a un tribunal de inferior jerarquía que cumpla o ejecute un acto que forma parte de sus deberes y atribuciones. Art. 649 del Código de Enjuiciamiento Civil (1933), 32 L.P.R.A. sec. 3421. Este recurso, por mandato expreso de ley, es uno altamente privilegiado y su expedición es discrecional. *Noriega v. Hernández Colón, supra*. Además, este Tribunal está facultado para expedirlo como parte de su jurisdicción original. *Véanse* Const. E.L.A., Art. V, Sec. 5, 1 L.P.R.A.; Ley de la Judicatura de 2003, Art. 3.002(a), 4 L.P.R.A. sec.

24s(a); Art. 650 del Código de Enjuiciamiento Civil (1933), 32 L.P.R.A. sec. 3422.

La procedencia del *mandamus* depende inexorablemente del carácter del acto que se pretende compeler mediante dicho recurso. D. Rivé Rivera, *Recursos Extraordinarios*, 2da ed., San Juan, Ed. U.I.A., 1996, pág. 107. Sólo procede para ordenar el cumplimiento de un deber ministerial, que no admite discreción en su ejercicio, cuando no hay otro mecanismo en ley para conseguir dicho remedio. Báez Galib y otros v. C.E.E., 152 D.P.R. 382 (2000).

Un aspecto medular que debe ser evaluado para determinar si procede o no el *mandamus* contra los miembros de la Asamblea Legislativa es el carácter de la función que se pretende compeler. Ello en vista de que no procedería el auto para ordenar la ejecución de actividades legislativas legítimas, toda vez que éstas están protegidas por la inmunidad parlamentaria que surge de la Sección 14 del Artículo III de nuestra Constitución. Romero Barceló v. Hernández Agosto, 115 D.P.R. 368 (1984). Hemos resuelto en el pasado que las actividades legislativas legítimas comprenden, entre otros eventos, la formulación de las leyes, la investigación, la fiscalización del Gobierno, el debate de asuntos de interés público, y mantener informado al pueblo sobre la marcha de la cosa pública. *Id.*

Ahora bien, ello no significa que toda actividad que se celebre o ejecute en la Asamblea Legislativa está cubierta por la inmunidad parlamentaria, por lo que debemos distinguir entre un acto legislativo y una acción no legislativa. Silva v. Hernández Agosto, *supra*.

En vista de ello, al evaluar la actividad para fines de la inmunidad parlamentaria, "lo determinante [será] la naturaleza del acto y su relación con el proceso deliberativo y de votación inherente a las funciones parlamentarias". *Id*., pág. 60. Examinemos este aspecto en otras jurisdicciones con el propósito de ilustrar nuestro razonamiento.

En Kavanaugh v. Chandler, 255 Ky. 182, 72 S.W. 2d 1003 (1934), el más alto foro judicial de Kentucky se enfrentó a una situación muy similar a la de autos. Un ciudadano presentó una petición de *mandamus* para obligar al Presidente del Senado de ese estado a firmar unas medidas que fueron aprobadas por ambos cuerpos de la Asamblea Legislativa. Las medidas habían sido aprobadas siguiendo el trámite legislativo ordinario y, posteriormente, enroladas y firmadas por el Presidente de la Cámara. En ese momento, los proyectos de ley fueron enviados al Presidente del Senado, pero éste se negó a firmarlos por entender que la Cámara había incumplido con un requisito procesal posterior a la aprobación de las medidas. Ante la negativa del Presidente del Senado de

firmar las leyes, éstas se dieron por aprobadas y se le enviaron al gobernador, quien también las firmó.

Al analizar la controversia planteada, dicho foro concluyó que el Presidente del Senado estaba obligado por mandato constitucional a firmar una ley una vez ésta fuera aprobada por ambos cuerpos legislativos. La Constitución de Kentucky obliga a los presidentes de los cuerpos legislativos a firmar las leyes una vez éstas sean debidamente aprobadas y se cumplan los trámites formales dispuestos. Por esta razón, el tribunal razonó que el acto de firmar una ley aprobada es una función ministerial que no involucra acto alguno de discreción legislativa.[4] Al tratarse de un deber ministerial, procedía la petición de *mandamus* para compeler al legislador a descargar su obligación.[5]

Del mismo modo, otros tribunales estatales han concurrido en el razonamiento de que, cuando se trata de funciones de carácter imperativo por virtud de una ley o

---

[4] "[S]ince the Constitution peremptorily directs that the officer shall sign the bills under the conditions specified, he has no discretion and his act is ministerial in character. It is familiar law that the courts may mandatorily require a public officer to perform his duty. (…) We have so held in relation to the executive. (…) And it is no usurpation of legislative powers or an invasion of the functions of that independent branch of the government for the court to compel its officers by the law upon them where the element of discretion does not enter. 255 Ky. 182, 72 S.W. 2d 1003, 1005 (1934)."

[5] Como cuestión de hecho, en este caso se declaró sin lugar la petición de *mandamus* por otros fundamentos que no están relacionados a la controversia del presente recurso.

una constitución, procede una petición de *mandamus* para ordenar a un legislador a cumplir con su deber ministerial.

Por ejemplo, en State ex rel. Donnell v. Osburn, 147 S.W. 2d 1065 (1941), el Tribunal Supremo de Missouri tuvo ante su consideración una disposición de la Constitución de ese estado que le requiere al Presidente de la Cámara de Representantes certificar los resultados de una elección y ordenar su publicación oficial, una vez fueran contabilizados los votos. No obstante lo anterior, el Presidente de la Cámara de Representantes de Missouri se negó a certificar los resultados de una elección para el cargo de gobernador. En vista del mandato constitucional expreso, el Tribunal Supremo de Missouri declaró con lugar una petición de *mandamus* y le ordenó al Presidente de la Cámara de Representantes a anunciar el ganador y a publicar los resultados de la contienda electoral. Según razonó el tribunal, el acto de declarar al gobernador electo es uno ministerial y no legislativo, independientemente de que quien lo lleve a cabo sea el Presidente de la Cámara de Representantes.[6]

Asimismo, en Pennsylvania State Association of County Commissioners v. Commonwealth of Pennsylvania, 545 Pa. 324, 681 A.2d 699 (1996), el Tribunal Supremo de

---

[6] "It is our judgment that the duty commanded by [art. 5, Section 3] is imposed on the speaker and is clear, peremptory and ministerial and therefore one which may be directed by mandamus." *State ex rel. Donnell v. Osburn*, 147 S.W. 2d 1065, 1069 – 1070.

Pennsylvania declaró con lugar una petición de *mandamus* y ordenó que la Rama Legislativa legislara, dentro de un término específico, para conjurar un esquema inconstitucional de financiamiento judicial. Según razonó el tribunal, cuando se le ha ordenado a la legislatura a actuar para curar un defecto constitucional que afecta directamente la existencia de la rama judicial, la legislatura no está inmune de ser demandada por razón de la inmunidad parlamentaria. Si así fuera, el deber de la Rama Judicial de interpretar la Constitución de Pennslyvania sería coartado y sería ineficaz el sistema de separación de poderes que es el principio fundamental de la Constitución.[7]

Igualmente, en <u>Ex parte Pickett</u>, 24 Ala. 91 (1854), el Tribunal Supremo de Alabama le ordenó al Presidente de la Cámara de Representantes a certificarle al Contralor de ese estado la suma a la cual tenía derecho otro representante de la Cámara por concepto de dietas y millaje. La ley establecía el procedimiento mediante el cual se determinaría la compensación debida, por lo que

---

[7] "Where the legislature has been directed by this court to act in order to remedy a constitutional defect in the scheme which funds the court system, funding if which is necessary for the continued existence of the judicial branch of government, the legislature is not insulated from suit by the speech and debate clause. If it were, this court's duty to interpret and enforce the Pennsylvania Constitution would be abrogated, thus rendering ineffective the tripartite system of government which lies at the basis of our constitution." *Pennsylvania State Association of County Commissioners v. Commonwealth of Pennsylvania*, 545 Pa. 324, 331 (1996).

el deber del Presidente de la Cámara era un trámite ministerial, no discrecional.

Del mismo modo, en <u>State v. Moffitt</u>, 5 Oh. 358 (1832), el Tribunal Supremo de Ohio concluyó que procede un *mandamus* para obligar a los presidentes de ambos cuerpos legislativos a certificar la elección de un juez, conforme establecen las leyes y la constitución de ese estado.[8]

Según hemos expuesto, es un principio aceptado por las jurisdicciones estatales que aquellas funciones meramente ministeriales, que no involucran el ejercicio de discreción del legislador, y que forman parte del aspecto mecánico del proceso legislativo, están sujetas al recurso de *mandamus*. Como nos señala un reconocido tratadista del proceso legislativo:

> Cuando le sea requerido al presidente del cuerpo firmar un proyecto para autenticar su aprobación, **el acto de firmar es simplemente ministerial y no un ejercicio de discreción legislativa; por tanto**, el ***mandamus* procederá para forzar su ejecución**. Resolver lo contrario daría al presidente del cuerpo, de hecho, un poder de veto sobre los actos del cuerpo legislativo. (Énfasis suplido y traducción

---

[8] Según concluyó el Tribunal Supremo de Ohio: "[The] act to provide for commissioning certain officers', 29 Ohio L. 409, contains this proviso, 'That the election of all officers elected or appointed by the legislature shall be certified by the speakers of both houses.' Should the two speakers refuse to sign such certificate (…), power is vested in this court to compel them to do it. By section 3 of the practice act, 29 Ohio L. 56, the Supreme Court is authorized to issue a *mandamus* in proper cases. And in case of such refusal, this would be undoubtedly a competent and proper remedy." 5 Oh. 358, 361 (1832).

nuestra.) *Mason´s Manual of Legislative Procedures*, Ed. 2000, Sec. 575(3), pág. 417.[9]

B.

En este caso, se somete ante nuestra consideración una controversia de gran envergadura para requerir al Presidente de la Cámara de Representantes y al Secretario del referido cuerpo que ejecuten actos ministeriales, con el fin de dar curso al ordenamiento constitucional que gobierna la aprobación de las leyes. Se nos solicita que ordenemos a estos funcionarios a enrolar el Sustitutivo al P. de la C. 2193, certificar la aprobación de esta medida por ambos cuerpos legislativos y someterla al escrutinio del Primer Ejecutivo. Esta controversia indudablemente impacta el interés público y nuestro sistema republicano de gobierno. De sus comparecencias ante nos, es evidente el conflicto entre los dos cuerpos legislativos sobre el asunto de autos y la controversia constitucional entre la Asamblea Legislativa y el Poder Ejecutivo. En vista de la importancia y magnitud de los planteamientos constitucionales respecto al proceso legislativo y dada la imperiosa necesidad de mantener el ordenamiento constitucional que garantiza nuestro sistema republicano de gobierno, resolvemos que el *mandamus* es el

---

[9] "When a presiding officer is required to sign a bill to authenticate its passage, the act of signing is simply ministerial and not an exercise of legislative discretion; therefore, mandamus will lie to compel its performance. To hold otherwise would give the presiding officer, in effect, a veto upon the acts of the legislative body."

recurso adecuado para examinar esta controversia. Procedemos, por tanto, a evaluar sus méritos.


IV.

A.

La Sección 19 del Artículo III de la Constitución del Estado Libre Asociado de Puerto Rico, *supra*, establece el procedimiento mediante el cual se aprueban las leyes en nuestro ordenamiento jurídico. Al así hacerlo, nuestra Asamblea Constituyente distribuyó el poder de hacer las leyes entre la Rama Legislativa y la Ejecutiva. Dicha disposición reza, en lo aquí pertinente, de la siguiente manera:

> Cualquier proyecto de ley que sea aprobado por una mayoría del número total de los miembros que componen cada cámara **se someterá al Gobernador** y se convertirá en ley si éste lo firma o si no lo devuelve con sus objeciones a la cámara de origen dentro de diez días (exceptuando los domingos) contados a partir de la fecha en que lo hubiese recibido. (Énfasis suplido.)

Este mandato constitucional también se relaciona con el que surge de la Sección 4 del Artículo IV, mediante el cual se faculta al Gobernador a sancionar o desaprobar los proyectos de ley aprobados por la Asamblea Legislativa.

La citada Sección 19 formaba parte del procedimiento incorporado en la Carta Orgánica de 1917, la cual había probado su eficacia en la práctica. *Véase* 4 Diario de

Sesiones de la Convención Constituyente, pág. 2586 (2003) (Informe de la Comisión de la Rama Legislativa). En ésta, asimismo, se requería que la aprobación de los proyectos de ley ocurriese por acción de una mayoría del número total de los miembros de cada cámara. J. Trías Monge, <u>Historia Constitucional de Puerto Rico</u>, Río Piedras, Ed. U.P.R., 1982, Vol. III, pág. 162. En lo aquí pertinente, la Carta Orgánica establecía:

> Ningún proyecto de ley pasará a ser ley hasta que sea aprobado en cada Cámara en votación por lista por una mayoría de todos los miembros que la componen, y registrado en el libro de actas, y haya sido aprobado por el Gobernador dentro de los diez días siguientes. Art. 34 de la Carta Orgánica de 1917, 1 L.P.R.A., Documentos Históricos.

Una simple apreciación del referido texto nos señala la ausencia de la expresión imperativa de que el proyecto de ley "se someterá al Gobernador" para su aprobación, incluida en nuestra Constitución. Sin embargo, la referida expresión resultaba innecesaria ante el mandato que se disponía más adelante en el mismo Art. 34 de la Carta Orgánica:

> El Presidente de cada Cámara **firmará**, en presencia de la Cámara que presida, **todos los proyectos de ley y resoluciones conjuntas aprobados por la Asamblea Legislativa**, después que sus títulos hayan sido leídos públicamente, inmediatamente antes de firmar; y el hecho de firmar se hará constar en el acta. (Énfasis suplido.) *Id.*

Como podemos observar, el ordenamiento legal vigente bajo la Ley Orgánica de 1917 disponía un mandato expreso sobre los presidentes de ambos cuerpos legislativos para firmar los proyectos de ley debidamente aprobados por la mayoría de los miembros de cada cámara legislativa antes de que el Gobernador los considerara como parte de sus facultades. Nuestra Constitución carece de un texto análogo al anterior.

No obstante, en el ejercicio interpretativo constitucional, debemos entender que este último mandato está incorporado a la antes citada Sección 19 del Artículo III de nuestra Constitución.

La razón para concluir de este modo nos parece obvia. La firma de un proyecto de ley por parte de los respectivos presidentes de los cuerpos legislativos es un mecanismo de autenticación de la medida aprobada, el cual debe ser realizado antes de someter el proyecto de ley a la consideración del Gobernador. En vista de que nuestra Constitución ordena <u>someter</u> al Gobernador todos los proyectos de ley aprobados por ambos cuerpos legislativos, dicho mandato incluye por implicación que estos proyectos sean preparados para su entrega. En fin, nuestra Constitución no necesitaba un precepto similar al incorporado en la Carta Orgánica de 1917, toda vez que la expresión imperativa "se someterá al Gobernador", refiriéndose a todo proyecto de ley, aprobado finalmente por una mayoría de ambos cuerpos, trae consigo la

obligación de realizar aquellos actos ministeriales que ordinariamente se llevan a cabo antes de trasladar las medidas a la consideración del Primer Ejecutivo, como por ejemplo, que sean enroladas y firmadas por los presidentes del Senado y de la Cámara.[10]

No olvidemos que al interpretar los contornos de nuestra Constitución, debemos garantizar su vigorosidad y relevancia a los problemas socio-económicos y políticos de nuestro tiempo. Nogueras v. Hernández Colón, 127 D.P.R. 405 (1990); López Vives v. Policía de P.R., 118 D.P.R. 219 (1987). Debemos, igualmente, "evitar que interpretaciones inflexibles y el apego a viejos modelos impidan su aplicabilidad a las eventualidades del futuro y en pocos años tornen obsoleta una constitución diseñada para guiar la vida de un pueblo por varios siglos". Nogueras v. Hernández Colón, supra, a la pág. 411. A diferencia de las leyes, nuestra Constitución está redactada en términos amplios que establecen principios generales y no reglas específicas. Id., pág. 412. Nuestra Constitución prescribe las formalidades más importantes que debe seguir todo proyecto para convertirse en ley. Néstor Rigual, El Poder Legislativo de Puerto Rico, pág.

---

[10] Véase, a modo ilustrativo, Field v. Clark, 143 U.S. 649, 671 (1892), donde el Tribunal Supremo de Estados Unidos expuso: "A pesar de que la Constitución no requiere expresamente que los proyectos de ley aprobados por el Congreso contengan las firmas de los oficiales que presiden ambos cuerpos, el uso, la conducta ordenada del proceso legislativo y las normas bajo las cuales ambos cuerpos se han conducido desde la organización del gobierno requieren dicho modo de autenticación". (Traducción nuestra.)

91 (Ed. U.P.R., 1961). A tenor con ello, debemos interpretar sus preceptos con vitalidad.

Conforme a lo señalado, y en virtud de la Sección 19 del Artículo III de nuestra Constitución, un proyecto de ley que ha sido aprobado por una mayoría de los miembros de la Cámara de Representantes y del Senado, y que de esta manera se convirtió en una legislación de ambas cámaras, deberá someterse al Gobernador para que éste, a su vez, pueda aprobarlo o desaprobarlo. Este mandato constitucional implica, a su vez, que el proyecto de ley debidamente aprobado por la mayoría de ambos cuerpos legislativos sea preparado para su entrega al Primer Ejecutivo, lo que conlleva ejercer todo trámite ministerial previo a este último acto.

En vista del lenguaje utilizado en dicha cláusula constitucional, una vez ambos cuerpos han aprobado finalmente una ley, la Asamblea Legislativa no tiene la discreción de optar por no someter el proyecto al Primer Ejecutivo. Asimismo, no son actos discrecionales el enrolado y la certificación de la medida como pasos previos a su traslado al Gobernador.

Como corolario de lo anterior, tanto la Cámara de Representantes como el Senado tienen un deber ministerial de someterle al Gobernador todo proyecto de ley aprobado finalmente por éstos. Por ende, una cámara no tiene autoridad para retener un proyecto de ley luego de que éste ha sido debidamente aprobado. Resolver lo contrario

equivaldría a **"avalar una práctica mediante la cual una cámara o una o varias personas, como presidentes de la Legislatura, pudieran anular la votación inequívoca de los representantes del Pueblo."** (Traducción nuestra.) Campaign for Fiscal Equity, Inc. v. Marino, 661 N.E. 2d 1372, 1373 (1995).

Permitir que uno o ambos cuerpos de la Asamblea Legislativa retengan un proyecto de ley luego de su aprobación, resultaría en un limbo jurídico que socavaría el poder constitucional que se le confiere al Ejecutivo de aprobar o vetar las leyes. *Véase a* King v. Cuomo, 613 N.E. 2d 950 (1993). Como acertadamente señaló el Tribunal Supremo del Estado de Nueva York al analizar una disposición constitucional casi idéntica a la que aquí examinamos:

> La práctica [de no someterle al Gobernador un proyecto de ley una vez ha sido aprobado por ambas cámaras] mina tanto la integridad del proceso de aprobación de leyes como los principios [en los que se apoya la doctrina de separación de poderes]. Requerir que la Legislatura se adhiera a este mandato constitucional no equivale...a sobreponer la forma sobre la sustancia, sino a asegurarnos que la función de aprobación de las leyes se mantenga confiable, consistente, y expuesta al escrutinio del público. (Traducción nuestra.) *Id.*, pág. 954.

En fin, somos del criterio que la Asamblea Legislativa no tiene la discreción para elegir si le presenta o no un proyecto de ley al Gobernador, una vez dicho proyecto es aprobado finalmente tanto por la Cámara

de Representantes como por el Senado. Esto en atención a que, mediante la Sección 19 del Artículo III de nuestra Constitución, se le impone un deber ministerial a dicho organismo de someterle al Primer Ejecutivo todo proyecto de ley debidamente aprobado por ambas cámaras.

Esto, además de ser la norma imperante en nuestra jurisdicción, es cónsono con el entendido general que se tiene acerca de este asunto en otras jurisdicciones. A esos efectos, en un conocido tratado se expresa que **"el deber de firmar [un proyecto de ley aprobado por ambos cuerpos legislativos] es uno ministerial y accionable judicialmente."** I Norman J. Singer, Sutherland Statutes and Statutory Construction, Sec. 15.1 (6ª ed., 2005). Por ende, **"el oficial que preside [la cámara] no tiene discreción para rehusarse a [firmar el proyecto]"**. *Id.* (Traducción nuestra).

B.

Por otra parte, tomamos conocimiento judicial de que en Puerto Rico, tradicionalmente, cuando el Senado o la Cámara de Representantes de Puerto Rico origina y aprueba una medida, ésta se envía al otro cuerpo para su consideración. Luego de los trámites de rigor, el otro cuerpo puede realizar algún tipo de enmienda al proyecto y proceder con su aprobación. Si se realizara alguna enmienda, se devuelve el proyecto al cuerpo de origen para que éste decida si acepta las enmiendas efectuadas. Si este cuerpo no las acepta no existe un texto aprobado

que, conforme lo dispone la Sección 19 del Artículo III de la Constitución, pueda ser sometido al Gobernador, por lo cual se convoca al Comité de Conferencia.

En dicho Comité, una delegación de legisladores, en representación de ambos cuerpos, analiza las dos versiones de la medida aprobada, y recomienda al pleno una versión final del proyecto, la cual se somete a votación ante ambos cuerpos. De aprobarse esta última versión, se envía a la consideración del Gobernador. Todo proyecto de ley que es aprobado por ambos cuerpos se imprime en forma final enrolado, o sea, se eliminan los números al margen y los blancos entre líneas, y se le asigna el título de ley o resolución conjunta, según sea el caso. El Secretario del último cuerpo que aprobó el proyecto certifica dicho acto. La medida entonces está lista para la firma de los presidentes de ambos cuerpos legislativos. Una vez firmada, la pieza se somete al Gobernador para su consideración. *Véanse* Néstor Rigual, *op cit.*, págs. 91-110; Oficina de Servicios Legislativos, *La Asamblea Legislativa y El Poder Legislativo*, 1997, págs. 41-45.

El aludido proceso depende, en gran medida, de la reglamentación que hayan aprobado ambos cuerpos para organizar el procedimiento legislativo. Esto en vista de que la Sección 9 del Artículo III de nuestra Constitución establece que: "Cada Cámara [...] adoptará las reglas

propias de cuerpos legislativos para sus procedimientos y gobierno interno".

Como parte de esta facultad, ambos cuerpos pueden reglamentar el proceso de reconsideración de una medida legislativa. *Véase*, *Mason´s Manual of Legislative Procedures*, *op cit.*, Sec. 450, págs. 299-301. Mientras cada cuerpo pueda reconsiderar la medida, según su propia reglamentación, no surge aún el deber ministerial de someter un proyecto de ley al Gobernador, según lo dispone la Sección 19, Artículo III de la Constitución. Ahora bien, debemos señalar que el poder inherente que tiene cada cámara para reconsiderar una acción deja de ser absoluto en el momento en que el asunto aprobado se envía a la consideración de otra cámara. *Véase* Nestor Rigual, *op cit.* págs. 108-109. A este respecto se ha expresado que:

> Una medida no puede ser reconsiderada a menos que esté en posesión del cuerpo. En cuerpos legislativos bicamerales, una medida que haya sido enviada a la otra cámara tiene que ser devuelta antes de que una reconsideración pueda ser efectiva. *Mason´s Manual of Legislative Procedures, op cit.*, Sec. 454(1), pág. 304. (Traducción nuestra).

En igual sentido, *véase*, L.S. Cushing, *Elements of the Law and Practice of Legislative Assemblies*, Boston, Rothman & Co., 1989, Sec. 1274, pág. 508. Lo contrario fomentaría la intromisión indebida de una cámara con los procedimientos de su hermano foro legislativo. Por ello,

hace casi cien años la Corte de Apelaciones del estado de

West Virginia razonó que:

> Un principio fundamental de [derecho parlamentario] es que un cuerpo legislativo debe tener posesión y control de una medida para poder reconsiderar el voto mediante el cual se aprobó. Si ya [fue aprobada dicha medida], y ya no está bajo el control y posesión de dicho cuerpo, no se puede reconsiderar. Se ha perdido jurisdicción. El caso ya no está ante [el organismo]. **Ni un cuerpo legislativo ni una corte pueden actuar sobre algo que no tiene ante sí**. (Traducción nuestra.) <u>Smith v. Mitchell</u>, 72 S.E. 755, 758 (1911).

Con esto coincide el historiador Néstor Rigual al

explicar en su libro sobre el poder legislativo de Puerto

Rico que:

> Si [la reconsideración] se formula después que el proyecto ha sido remitido o devuelto al otro Cuerpo, se requiere entonces que, junto con la solicitud de consentimiento para reconsiderar, se pida la devolución de la medida.
>
> La devolución para reconsiderar, se hace si el proyecto ha sido ya aprobado por una de las cámaras y se encuentra ante la consideración de la otra. **Pero, si hubiere sido aprobado por ambas Cámaras, y todavía no firmado por el Presidente del Cuerpo de origen, porque éste deseare reconsiderarlo, entonces aquél solicita el consentimiento del otro cuerpo para entrar en la reconsideración**. Néstor Rigual, *op cit.*, pág. 109.

Una vez un proyecto ha sido debidamente aprobado por

una mayoría de los miembros que componen ambos cuerpos

legislativos, "la medida pasa a ser cosa única de la

Asamblea Legislativa [y] para que una cámara pueda entrar

a la reconsideración de aquélla, tiene que solicitar el

consentimiento de la otra." *Id.* pág. 109. No debemos olvidar que por mandato constitucional, el Poder Legislativo es ejercido por el Senado y la Cámara de Representantes conjuntamente. Const. E.L.A., Art. III, Sec. 1.

A tenor con esta discusión, un cuerpo pierde autoridad para reconsiderar un proyecto de ley que pasó a la atención del otro por tratarse ya de una medida que, por así decirlo, pertenece a ambos cuerpos. Sin embargo, ello puede hacerse en las ocasiones en que el otro cuerpo consienta a devolver el proyecto al cuerpo de origen con el propósito de que el mismo sea reconsiderado o enmendado.

Con esta normativa en mente, pasemos a examinar los hechos que generaron el caso ante nos.

V.

Los demandantes sostienen que, una vez una mayoría de los miembros que componen tanto la Cámara de Representantes como el Senado aprobaron el Proyecto Sustitutivo al P. de la C. 2193 el 21 y el 25 de junio de 2006, respectivamente, los presidentes de ambas cámaras tenían un deber ministerial de someter el proyecto ante la consideración del Primer Ejecutivo. Les asiste la razón.

Como hemos expresado, la Sección 19 del Artículo III de nuestra Constitución establece mediante un lenguaje

claro, imperativo e inequívoco que un proyecto de ley debidamente aprobado por ambas cámaras debe ser sometido al Gobernador. De conformidad con lo anterior, la Asamblea Legislativa tiene el deber de presentarle el proyecto al Primer Ejecutivo dentro de un término razonable después de su aprobación.

En el caso de autos, el 21 de junio de 2006 la Cámara de Representantes aprobó por mayoría de sus miembros el proyecto en controversia. Ese mismo día, el proyecto fue enviado a la consideración del Senado. El 25 de junio de 2006, el Senado, a su vez, aprobó, sin enmiendas, la referida medida legislativa. En ese momento el proyecto de la ley se convirtió en uno de ambos cuerpos.

Sin embargo, el 27 de junio de 2006 la Cámara de Representantes convocó una nueva sesión y, mediante el mecanismo de reconsideración, aprobó una versión enmendada del Proyecto Sustitutivo al P. de la C. 2193. El próximo día, 28 de junio, la Oficina de Actas y Récords de la Cámara de Representantes intentó introducir al Senado una comunicación para informar la reconsideración de la medida. No obstante, el Secretario del Senado, por instrucciones del Presidente, no accedió a recibirla por considerarla improcedente. Posteriormente, una mayoría del Senado, en su sesión del 29 de junio de 2006, sostuvo la decisión del Presidente.

Por ende, el Senado claramente no consintió a que se devolviera el proyecto a la Cámara de Representantes.

En vista de la denegatoria del Senado a reconsiderar la medida, el Proyecto Sustitutivo al P. de la C. 2193 fue aprobado finalmente por ambos cuerpos legislativos el 21 y 25 de junio. En este instante, se activó el mandato constitucional de la Sección 19 del Artículo III, al ser aprobado el referido proyecto de ley por la mayoría de los miembros que componen cada cámara, sin la necesidad de mayor trámite legislativo. Es decir, únicamente resta por realizar aquellos trámites ordinarios que no involucran discreción legislativa para preparar la medida para su envío al Gobernador. En este momento surge el deber ministerial de someterle el proyecto según aprobado al Gobernador.

## VI.

En vista de los fundamentos que anteceden, se expide el auto de *mandamus* y se le ordena al Presidente de la Cámara de Representantes, Hon. José F. Aponte Hernández, cumplir con su deber ministerial y certificar el proyecto Sustitutivo al P. de la C. 2193, según aprobado por ambos cuerpos legislativos el 21 y 25 de junio de 2006, dentro del plazo de veinticuatro (24) horas, contado a partir de la notificación de esta Opinión y Sentencia. Simultáneamente, y de manera subsidiaria, se ordena al Secretario de la Cámara de Representantes, licenciado José E. Meléndez Ortiz, que realice en dicho plazo todas

aquellas gestiones necesarias para someter el citado proyecto de ley a la consideración del Gobernador, Hon. Aníbal Acevedo Vilá.

Si dentro del mencionado plazo no se le somete al Gobernador la pieza legislativa por los referidos funcionarios de la Cámara de Representantes, a los fines de viabilizar la pronta resolución de la situación surgida, a tenor con lo dispuesto en la Regla 51.3(a) de las Reglas de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 51.3(a),[11] y en vista de lo informado a este Tribunal por el Presidente del Senado, Hon. Kenneth McClintock Hernández, "de que tiene la total disposición de cumplir con su deber ministerial y de cumplir con el trámite requerido por la Constitución", dicho funcionario deberá proceder a firmar el referido proyecto y remitirlo al Gobernador de Puerto Rico, Hon. Aníbal Acevedo Vilá, de manera inmediata, y así dar por cumplido el mandato de la Sección 19 del Artículo III de la Constitución.

Se dictará Sentencia de conformidad.

Federico Hernández Denton

---

[11] "Si una sentencia ordenare a una parte transferir el dominio de terrenos y otorgar escrituras y otros documentos, o **realizar cualquier otro acto específico**, y dicha parte dejare de cumplir dicha orden dentro del término especificado, el tribunal podrá ordenar que el acto se realice por otra persona por él designada, a expensas de la parte que incumple y cuando se haya realizado, tendrá el mismo efecto que si hubiere sido efectuado por la parte [...] El tribunal podrá, además, en casos apropiados, procesar a dicha parte por desacato." (Énfasis suplido).

Juez Presidente

Juez Presidente

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Hon. Aníbal Acevedo Vilá,          *
Gobernador del Estado Libre Asociado   *
de Puerto Rico                     *
                                   *
Hon. José Luis Dalmau Santiago     *
Senador del Distrito de Humacao    *
                                   *
    Demandantes                    *
                                   *
        vs.                        * MD-2006-06
                                   *
Hon. José F. Aponte Hernández,     *
Presidente de la Cámara de         *
Representantes                     *
                                   *
José Enrique Meléndez Ortiz        * Mandamus
Secretario de la Cámara de         *
Representantes                     *
                                   *
Hon. Kenneth McClintock Hernández, *
Presidente del Senado y            *
                                   *
Senado de Puerto Rico, por conducto *
de su Presidente,                  *
Hon. Kenneth McClintock Hernández  *
                                   *
    Demandados                     *
                                   *
*******************************************


SENTENCIA


San Juan, Puerto Rico, a 3 de julio de 2006.


Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte integral de la presente, se expide el auto de *mandamus* y se le ordena al Presidente de la Cámara de Representantes, Hon. José F. Aponte Hernández, cumplir con su deber ministerial y certificar el proyecto Sustitutivo al P. de la C. 2193, según aprobado por ambos cuerpos legislativos el 21 y 25 de junio de 2006, dentro del plazo de veinticuatro (24) horas, contado a partir de la notificación de esta Opinión y Sentencia. Simultáneamente, y de manera subsidiaria, se ordena al Secretario de la Cámara de Representantes, licenciado José E. Meléndez Ortiz, que realice en dicho plazo todas aquellas gestiones necesarias para someter el citado proyecto de ley a la consideración del Gobernador, Hon. Aníbal Acevedo Vilá.

Si dentro del mencionado plazo no se le somete al Gobernador la pieza legislativa, por los referidos funcionarios de la Cámara de Representantes, a los fines de viabilizar la pronta resolución de la situación surgida, a tenor con lo dispuesto en la Regla 51.3(a) de las Reglas de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 51.3(a), y en vista de lo informado a este Tribunal por el Presidente del Senado, Hon. Kenneth McClintock Hernández, "de que tiene la total disposición de cumplir con su deber ministerial y de cumplir con el trámite requerido por la Constitución", dicho funcionario deberá proceder a firmar el referido proyecto y remitirlo al Gobernador de Puerto Rico, Hon. Aníbal Acevedo Vilá, de manera inmediata, y así dar por cumplido el mandato de la Sección 19 del Artículo III de la Constitución.

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Fuster Berlingeri emitió una Opinión de Conformidad y Concurrente. La Jueza Asociada señora Rodríguez Rodríguez emitió una Opinión de Conformidad. El Juez Asociado señor Rivera Pérez "disiente del curso de acción de la Mayoría por entender que no está madura la controversia ante nos, por no haber concluido el proceso ante la Asamblea Legislativa, relativo al proyecto de ley en cuestión. El Senado de Puerto Rico no puede convertirse en juez de lo actuado por la Cámara de Representantes al proponer reconsiderar parcialmente la medida aprobada por ambos cuerpos, negarse a recibir la comunicación de la cámara baja sobre esos extremos ni declararla como improcedente como cuestión de derecho. Cada cámara legislativa es juez de sus propios actos y procedimientos internos. El Senado está obligado constitucionalmente, a través de su Secretaría, a recibir la comunicación escrita del cuerpo legislativo donde se originó la medida, que propuso reconsiderarlo después de ser aprobada por ambos cuerpos, con el propósito de conceder o negar su consentimiento a tal reconsideración. Por no haber cumplido al presente el Senado con su obligación y deber constitucional, no ha concluido el proceso legislativo, no está madura la controversia y no existe, por el momento, el deber ministerial de la Asamblea Legislativa de someter el proyecto de ley al Gobernador a tenor con la Sección 19. Documentos Históricos, 1 L.P.R.A., Art. III, Sec. 19, pág. 381."

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Hon. Aníbal Acevedo Vilá,            *
Gobernador del Estado Libre Asociado *
de Puerto Rico                       *
                                     *
Hon. José Luis Dalmau Santiago,      *
Senador del Distrito de Humacao      *
                                     *
     Demandantes                     *
                                     *
          Vs.                        *        MD-2006-06
                                     *
Hon. José F. Aponte Hernández,       *
Presidente de la Cámara de           *
Representantes                       *        Mandamus
                                     *
José Enrique Meléndez Ortiz,         *
Secretario de la Cámara de           *
Representantes                       *
                                     *
Hon. Kenneth McClintock Hernández;   *
Presidente del Senado y              *
                                     *
Senado de Puerto Rico, por conducto  *
de su Presidente,                    *
Hon. Kenneth McClintock Hernández    *
                                     *
     Demandados                      *
*************************************

Opinión de Conformidad y Concurrente emitida por el Juez Asociado SEÑOR FUSTER BERLINGERI.

San Juan, Puerto Rico, a 3 de julio de 2006.

Estoy conforme con lo que considero que son los dos aspectos medulares del caso de autos examinados tanto en la Opinión del Tribunal como en la Opinión de Conformidad de la Juez Asociada señora Rodríguez Rodríguez.

En primer lugar, y lo más esencial, estoy conforme en cuanto a que en el caso de autos la Cámara de Representantes de Puerto Rico no podía reconsiderar el proyecto de ley que ya había aprobado el 21 de junio de 2006, si no contaba con **el consentimiento del Senado de Puerto Rico**. Cuando la

Cámara realizó tal reconsideración el 27 de junio de 2006, el proyecto de ley que aquí nos concierne ya había sido aprobado íntegramente, sin cambio alguno, por el Senado. Este otro cuerpo de la Asamblea Legislativa le había impartido su aprobación al proyecto en cuestión el 25 de junio de 2006. Por tanto, al momento en que la Cámara de Representantes pretendió reconsiderarlo, dos días más tarde, **el proyecto referido ya estaba fuera de su jurisdicción**. Era entonces un proyecto de la Asamblea Legislativa, y por ello, la Cámara de Representantes no podía reconsiderarlo si el Senado no consentía a ello.

En segundo lugar, también estoy conforme en cuanto a que lo que procede ahora, al amparo de la Sección 19 del Art. III de la Constitución del Estado Libre Asociado de Puerto Rico, es que se someta al Gobernador de Puerto Rico el proyecto de ley que fue aprobado por ambas cámaras legislativas. Como la reconsideración por la Cámara de Representantes del proyecto aludido fue **inoficiosa**, por la razón indicada en el párrafo anterior, sólo subsiste válidamente el proyecto original según aprobado por la Cámara y el Senado el 21 y 25 de junio respectivamente. Este único proyecto válido debe ser sometido al Gobernador para su consideración, según lo dispone claramente la propia Constitución.

Por lo demás, no estimo necesarias las otras consideraciones que aparecen en las opiniones referidas. **El hecho medular e innegable es que hubo un importante proyecto**

3

**aprobado por ambas Cámaras**. Si el presidente de la Cámara lo quiere firmar o no es para mí de poca consecuencia. Al amparo de la innegable autoridad de este Foro, lo que procede es que ordenemos remitirlo al Gobernador para su consideración, sin mayores contemplaciones. Si tenemos autoridad para decidir que la reconsideración en cuestión fue inoficiosa, ciertamente la tenemos también para enviar al Gobernador el proyecto en cuestión por nuestra cuenta, para que éste proceda a considerarlo.

Jaime B. Fuster Berlingeri
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Hon. Aníbal Acevedo Vila,
Gobernador del Estado Libre
Asociado de Puerto Rico y
Hon. José Luis Dalmau, Senador
Del Distrito de Humacao

    Demandantes

                        MD-2006-6

      v.

Hon. José F. Aponte Hernández,
Presidente de la Cámara de
Representantes, et. al.

    Demandados


Opinión de Conformidad emitida por la Juez Asociada señora Rodríguez Rodríguez


San Juan, Puerto Rico, a 3 de julio de 2006

Tenemos ante nuestra consideración una controversia relacionada con el trámite legislativo seguido para la aprobación del proyecto de reforma contributiva, conocido como Ley de la Justicia Contributiva de 2006. Debemos determinar si, una vez un proyecto de ley es aprobado por ambas cámaras legislativas, la cámara de origen puede reconsiderar su votación original e introducir enmiendas al proyecto ya aprobado, sin la anuencia del otro cuerpo.

Estoy conforme con la determinación que hoy anuncia este Tribunal, pero dada la importancia que

reviste para nuestro ordenamiento constitucional la controversia planteada en este caso, hemos decidido suscribir esta Opinión de conformidad para expresar nuestros criterios sobre las disposiciones constitucionales que hoy interpretamos por primera vez.

**I**

Luego de un largo y controversial proceso, el pasado 21 de junio de 2006, la Cámara de Representantes de Puerto Rico aprobó el Sustitutivo P. de la C. 2193, conocido como la Ley de Justicia Contributiva de 2006. El mismo proveyó para enmendar la Ley Núm. 120 de 31 de octubre de 1994, conocida como el Código de Rentas Internas de Puerto Rico, a los fines de establecer, entre otras cosas, un impuesto general de ventas en Puerto Rico. El proyecto aprobado fue remitido al Senado de Puerto Rico para su aprobación. El 25 de junio, el Senado de Puerto Rico aprobó el referido proyecto sin enmiendas.

Así las cosas, y siguiendo el trámite ordinario, el Senado de Puerto Rico envió, a través de su Secretaría, el proyecto enrolado a la Cámara de Representantes.

Tomamos conocimiento judicial de que, inmediatamente después de la aprobación por el Senado, comenzó una discusión pública sobre y la tasa del impuesto sobre la venta que fuera aprobada. Por un lado, el Gobernador de Puerto Rico así como el Presidente del Senado señalaron públicamente que el proyecto aprobado por ambas cámaras proveía para un impuesto sobre la venta del 7%; mientras,

que la Cámara de Representantes reclamaba que el por ciento de impuesto aprobado fue de un 5.5%, que se distribuía en un 4% para el gobierno central y un 1.5% para los municipios.

Trabada así esta agria controversia, el pasado 27 de junio de 2006, el Presidente de la Cámara de Representantes convocó a dicho cuerpo a una sesión ordinaria para reconsiderar la medida. Durante la misma, la portavoz de la mayoría parlamentaria solicitó dejar sin efecto la Sección 40.1 del Reglamento de la Cámara de Representantes.[12]

El 28 de junio de 2006, el Gobernador de Puerto Rico le envió una carta al Presidente de la Cámara de Representantes solicitándole que le remitiera el proyecto aprobado el 21 de junio de 2006 para su firma. El señor Gobernador le indicó al Presidente de la Cámara que era su deber ministerial firmar el proyecto aprobado y remitir el mismo al Primer Ejecutivo. En su carta, el Gobernador informó que era su intención firmar el Sustitutivo P. de la C. 2193 una vez lo recibiera.

Al día siguiente, el Gobernador de Puerto Rico, Hon. Aníbal Acevedo Vilá y el portavoz de la minoría en el Senado de Puerto Rico, Hon. José Luis Dalmau Santiago

---

[12] La sección 40.1 del Reglamento de la Cámara de Representantes reza, en lo pertinente, de la siguiente manera:

> A solicitud de cualquier Representante la Cámara podrá acordar la reconsideración de un asunto que haya sido resuelto, **siempre que la solicitud se haga en la misma Sesión en que el asunto fue tratado o en el siguiente día de Sesión.** (Énfasis nuestro.)

acudieron ante nosotros mediante un recurso de *mandamus*. Se incluyeron como demandados al Presidente de la Cámara de Representantes, Hon. José F. Aponte Hernández, al Secretario de la Cámara de Representantes, licenciado José Enrique Meléndez, al Presidente del Senado, Hon. Kenneth McClintock Hernández y al Senado de Puerto Rico.

En el escrito presentado se impugnó la acción de la Cámara de Representantes de reconsiderar el Sustitutivo P. de la C. 2193. Se solicitó como remedio que se expidiese un *mandamus* ordenándoles a los presidentes de los cuerpos legislativos a firmar el proyecto según fue aprobado originalmente por ambas cámaras y remitirlo al señor Gobernador. Presentado el recurso de *mandamus* les concedimos a los demandados un término de dos días, hasta el 1ero de julio de 2006, para que comparecieran a expresar su criterio sobre el recurso instado.

Oportunamente los demandados comparecieron. Por un lado, el Senado de Puerto Rico se allanó a la solicitud del Gobernador. La Cámara de Representantes por su parte compareció y argumentó, esencialmente, que el recurso no era justiciable por plantear una cuestión política. Adujo también que los demandados no tenían legitimación activa y que la controversia no estaba madura por no haber culminado aun el proceso de la aprobación de las enmiendas realizadas al Sustitutivo P. de la C. 2193.

La controversia medular en este caso gira en torno al proceso de aprobación de una medida legislativa, su

naturaleza y sus requerimientos; así como sobre la facultad de uno de los cuerpos para reconsiderar su votación y enmendar el proyecto en cuestión, luego de que la otra cámara aprobara el proyecto de ley que le fuera remitido sin enmienda alguna. Ello, cuando la actuación de la cámara de origen se da al final de la sesión legislativa, específicamente, tres días antes del cierre de sesión y sin haber solicitado previamente la anuencia del Senado de Puerto Rico para proceder con la reconsideración.

Veamos entonces.

## II

El auto de *mandamus* es uno altamente privilegiado y de naturaleza discrecional. 32 L.P.R.A. sec. 3421. Véase, *Ortiz v. Muñoz*, 19 D.P.R. 850 (1913); *Dávila v. Superintendente de Elecciones*, 82 D.P.R. 264 (1960); *Báez Galib v. CEE II*, 152 D.P.R. 382 (2000). El mismo está concebido "para obligar a cualquier persona, . . . a cumplir un acto que la ley particularmente le ordena como un deber resultante de un . . . cargo o función pública, cuando ese deber no admite discreción en su ejercicio, sino que es ministerial." (Escolio omitido.) D. Rivé Rivera, *Recursos Extraordinarios*, Universidad Interamericana, 1989, pág. 85.

Un acto es ministerial cuando la ley prescribe y define el deber que tiene que ser cumplido de forma tal que no encierra el ejercicio de la discreción o juicio. Por el contrario, si la ley le permite al funcionario decidir si

cumple o no el acto interpelado, entonces no estamos ante un acto ministerial, y por consiguiente, está fuera del ámbito del recurso de *mandamus*. La decisión de lo que es, o no, "un deber ministerial" no es algo que se pueda determinar mediante la aplicación de una fórmula inflexible*. Partido Popular v. Junta de Elecciones*, 62 D.P.R. 745, 749 (1944). Tal determinación ha de surgir de la evaluación de todos los elementos de juicio disponibles para auscultar el propósito y significado del estatuto en cuestión. *Hernández Agosto v. Romero Barceló*, 112 D.P.R. 407, 418 (1982).

La exigencia de que el deber ministerial esté definido en una disposición legal "no impide ni exime a los tribunales de la obligación de interpretar la Constitución y las leyes. La procedencia del auto de *mandamus* no está proscrita por el hecho de que se requiera una interpretación judicial del deber ministerial invocado." *Báez Galib v. CEE II, ante*, pág. 392. *Rosati v. Haran*, 459 F. Supp. 1148, 1151 (D.N.Y. 1977). ("[M]*andamus* will not be precluded solely because judicial construction is required to clarify the duty. Thus, mandamus will lie not only where a federal officer has failed to comply with a specific statutory or regulatory directive, but also where a constitutionally mandated duty has not been performed.")

Por lo tanto, el hecho que tengamos que interpretar el deber ministerial invocado no impide que se expida el auto solicitado en circunstancias apropiadas. Por ello, no es

determinante para que proceda el recurso que el deber ministerial surja de forma clara y expresa de las disposiciones legales aplicables, pues como hemos dicho anteriormente "tal requisito reduciría nuestra función de interpretar la Constitución y las leyes." *Hernández Agosto v. Romero Barce*ló, *ante*, pág. 418.

La autoridad de este Tribunal para conceder el recurso de *mandamus* en jurisdicción original es harto conocida. De acuerdo a la Sección 5 del Artículo V de la Constitución del Estado Libre Asociado "[e]l Tribunal Supremo . . . podr[á] conocer en primera instancia de . . . aquellos recursos y causas que se determinen por ley". *Dávila v. Superintendente de Elecciones*, *ante*; *Noriega v. Hernández Colón*, 135 D.P.R. 406, 447-48 (1994); Constitución del Estado Libre Asociado, Art. V, Sec. 5; Código de Enjuiciamiento Civil, Arts. 649-650, 32 L.P.R.A. secs. 3421- 3422.

Para ejercitar nuestra jurisdicción original en un recurso de *mandamus* hemos establecido que deben cumplirse los siguientes factores: que la petición de *mandamus* vaya dirigida contra uno de los principales funcionarios del gobierno, se levanten cuestiones de gran interés público y que el asunto requiera una solución pronta y definitiva. *Dávila v. Superintendente de Elecciones, ante,* págs. 274-75; *Rodríguez v. Gobernador*, 129 D.P.R. 402, 409 (1991).

Asimismo, la ley dispone que no proceda la utilización del *mandamus* cuando exista otro recurso adecuado y eficaz

en el curso ordinario de la ley. 32 L.P.R.A. sec. 3423. Véase, además, *Álvarez de Choudens v. Tribunal Superior*, 103 D.P.R. 235 (1975). Se requiere, además, que el peticionario le haya hecho un requerimiento previo al demandado para que éste cumpla con el deber que se le exige, debiendo alegarse en la petición, tanto el requerimiento como la negativa, o la omisión del funcionario en darle curso. D. Rivé Rivera, *op. cit.*, pág. 125.

A la luz de la normativa expuesta, podemos concluir que en el presente caso procede la invocación de nuestra jurisdicción original para establecer los méritos del auto de *mandamus* solicitado.[13] En el presente caso, el problema planteado requiere una solución pronta y definitiva a través de nuestra intervención directa en un asunto que es, esencialmente, de naturaleza constitucional y que tiene hondas repercusiones para la marcha ordenada de la cosa pública.

**III**

La Constitución del Estado Libre Asociado de Puerto Rico, Art. III, Sec. 1, dispone que en Puerto Rico el Poder Legislativo lo ejerce la Asamblea Legislativa, la cual está compuesta por dos Cámaras, el Senado y la Cámara de Representantes. Es decir, la Constitución delega todo el poder legislativo en la Asamblea Legislativa; limitado

---

[13] No está en controversia que la parte peticionaria ha cumplido con los requisitos procesales del auto de *mandamus* según detallados anteriormente.

dicho poder únicamente por las restricciones que impone la Carta de Derechos. *Nogueras v. Hernández Colón*, 127 D.P.R. 405 (1999). Véase, R. Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico*, San Juan, Ed. Colegio Abogados, 1986, Vol. I, págs. 206-209 y 337-338. La Asamblea Legislativa de Puerto Rico no es un cuerpo de poderes enumerados. Por antonomasia, la Asamblea Legislativa es el Poder gubernamental más político y, en principio, el que debe ser más representativo de todos.

La función esencial de este Poder gubernamental, y que condiciona su denominación, es efectivamente la de emitir las leyes. Véase, *La Nueva Constitución de Puerto Rico*, Escuela de Administración Pública, Universidad de Puerto Rico, 1954, pág. 422.

La Constitución del Estado Libre Asociado, Art. III, Sec. 17, prescribe las formalidades procesales que deben seguir los cuerpos legislativos con todo proyecto para procurar su aprobación.[14] Los reglamentos de las respectivas

---

[14] La Constitución del Estado Libre Asociado de Puerto Rico, Art. III, Sec. 17, es resabio del pasado colonial y de las antiguas cartas orgánicas. A pesar de que durante la Convención Constituyente se trató de flexibilizar el trámite de aprobación de leyes, se mantuvieron aun en el texto constitucional muchas de las disposiciones anteriores. Disposiciones que fueron en su origen, producto de la actitud de desconfianza en la gestión de los cuerpos legislativos que prevalecía en la sociedad del Siglo XIX. Informe de la Comisión de la Rama Legislativa de la Asamblea Constituyente, 4 *Diario de Sesiones de la Asamblea Constituyente,* pág. 2584. Véase además, Williams, State Constitutional Limits on Legislative Procedure: Legislative Compliance and Judicial Enforcement, 48 *U. Pitt. L. Rev.* 797 (1987). Con gran agudeza Trías Monge indica que la retención en el texto constitucional de alguna de las disposiciones provenientes de la Ley Orgánica

Cámaras, aprobados éstos en virtud de lo dispuesto en la Constitución, Art. III, sec. 9, implementan estas disposiciones y proveen para el trámite correspondiente. Así también lo hacen varias disposiciones del Código Político. Véase, 2 L.P.R.A. secs. 182 *et seq*.

En la medida que la aprobación de una pieza legislativa se aparte de lo dispuesto en la Constitución, reglamento o estatuto, corresponderá a la Rama Judicial pasar juicio sobre lo acontecido y determinar el efecto de tal desviación. **Solamente el incumplimiento con alguno de los requisitos específicos dispuestos en la Constitución para la aprobación de legislación justificaría un decreto de que la medida fue aprobada en contravención a la Carta Suprema.** "Véase", *United States v. Flores Muñoz*, 495 U.S. 385, 391, n. 4 (1990); L Tribe, *American Constitutional Law*, Third Ed., Foundation Press, New York, 2000, sec. 3-13, pág. 380.

Veamos entonces algunas de las características sobresalientes del trámite de aprobación de medidas.

**IV**

**A**

El trámite para la aprobación de una pieza legislativa, a grandes rasgos, es el siguiente:

El proceso de aprobación se inicia evidentemente, con la presentación de proyectos y resoluciones en la Oficina

---

fue producto de la "adoración irreflexiva de la antigua legislación orgánica." J. Trías Monge, *Cómo Fue*, *Memorias*, La Editorial, Universidad de Puerto Rico, Río Piedras, 2005, pág. 169.

de Actas y Récords de la Cámara de Representantes o en su contraparte, la Oficina de Trámite y Récords del Senado de Puerto Rico. Presentado un proyecto de ley, se le asigna al mismo un número a través del cual se habrá de conocer durante todo el proceso legislativo, y se imprime el mismo con la numeración asignada y la referencia a la Cámara que lo origina.[15] El proyecto numerado e impreso se remite a la comisión con jurisdicción para su consideración. Véase para una discusión más detallada del proceso en Puerto Rico, N. Rigual, *El Poder Legislativo de Puerto Rico*, Ed. Universidad de Puerto Rico, Río Piedras, 1961, capt. 5. Véase además, A. Mikva, E. Lane, *An Introduction of Statutory Interpretation and the Legislative Process*, Aspen Publishing, New York, 1997; *Sutherland's Statutory Construction*, N. Singer edition, Thomson-West, 6th ed., 2002, vol. I, secs. 9.1 *et seq.*; www.camaraderepresentantes.org.

La comisión a su vez determina el curso de acción que habrá de proseguir el referido proyecto. Una vez la comisión concluye sus trabajos y prepara su informe favorable, con o sin enmiendas, se envía copia a la Comisión de Reglas y Calendario. Ésta última decide si el proyecto se lleva al hemiciclo para su discusión y eventual votación y cuándo ello ocurre.

---

[15] P. de la C. significa que se trata de un proyecto de ley presentado originalmente en la Cámara de Representantes. P. del S., por el contrario, se refiere a un proyecto de ley presentado en el Senado de Puerto Rico.

Aprobada la medida por el cuerpo de origen, se imprime nuevamente tal y como fue aprobada, y el Secretario de ese cuerpo envía copia de la misma al Secretario del segundo cuerpo, con la petición de que sea considerada por dicho cuerpo.

El trámite que se prosigue en el segundo cuerpo es idéntico al seguido en el primer cuerpo. Cuando la medida se aprueba, se reimprime en su forma enrolada.[16] Si la medida fue aprobada sin enmiendas, se envía a los Presidentes de ambas Cámaras para su firma y remisión al Gobernador para la acción final.

Si por el contrario la medida es aprobada con enmiendas, se envía al cuerpo de origen para su concurrencia con las enmiendas introducidas. Una vez éste concurra, la medida se firma por ambos presidentes y se envía al Gobernador para el trámite final.[17]

---

[16] Al final de la última página de todo proyecto enrolado, se imprime una línea para la firma del Presidente del Senado y otra para la del Presidente de la Cámara de Representantes. N. Rigual, *El Poder Legislativo de Puerto Rico*, Ed. Universidad de Puerto Rico, Río Piedras, 1961, pág. 104.

[17] Si el cuerpo de origen no concurre con las enmiendas, mediante moción en dicho cuerpo, se ordena el envío del proyecto a comité de conferencia. El comité de conferencia se compone de igual número de Senadores y Representantes. Éstos se ponen de acuerdo y preparan un informe con las enmiendas acordadas basadas en el texto en forma enrolada; o pueden si así lo estiman, demorar la acción de forma indefinida. Ahora bien, cuando se acuerdan las enmiendas, el Comité de Conferencia prepara un informe el cual es enviado directamente al hemiciclo para votación. Si se aprueba por ambos cuerpos, la medida es enrolada y se le añade la palabra conferencia al número legislativo. Una vez hecho eso, se firma por los presidentes de los cuerpos y se envía al Gobernador para el trámite final.

Este último trámite, la firma de los presidentes de los cuerpos legislativos **no es un requisito de exigencia constitucional**, de la misma forma que no lo es bajo la Constitución de los Estados Unidos.[18] El mismo sin embargo, es de importancia toda vez que **la firma en un proyecto enrolado atestigua que éste fue aprobado por cada cámara a tenor con el procedimiento constitucional para la aprobación de medidas.** Sutherland, *op. cit.*, sec. 15.1, pág. 814. En ese sentido, son eminentemente acertadas las siguientes expresiones del Tribunal Supremo de los Estados Unidos en el caso seminal de *Marshall Field & Co. v. Clark*, 143 U.S. 649, 672 (1892):

> **The signing by the Speaker of the House of Representatives, and by the President of the Senate, in open session, of an enrolled bill, is an official attestation by the two houses, through their presiding officers, to the President, that a bill, thus attested, has received, in due form, the sanction of the legislative Branch of the government, and that it is delivered to him in obedience to the constitutional requirement that all bills which pass Congress shall be presented to him.** (Énfasis nuestro.)

La firma del proyecto enrolado permite entonces remitir el mismo al Gobernador para que éste pueda descargar su obligación constitucional de, con su firma, convertir la medida aprobada en ley si esa es su intención

---

[18] Curiosamente, bajo la antigua Ley Orgánica del 1917, los presidentes de los cuerpos venían obligados a firmar las medidas aprobadas. Ley Orgánica del 1917, Art. 34, sec. 10. ("El Presidente de cada Cámara firmará, en presencia de la Cámara que presida, todos los proyectos de ley y resoluciones conjuntas aprobados por la Asamblea Legislativa, después que sus títulos hayan sido leídos públicamente, inmediatamente antes de firmar; y el hecho de formar se hará constar en el acta.")

o, por el contrario, vetar la misma. Constitución del Estado Libre Asociado, Art. III, Sec. 19. Adviértase que la Constitución dispone que sólo se conviertan en ley aquellas medidas **"aprobadas"** por una mayoría de los miembros que componen cada cámara.

En resumen, el proceso de verificación de la aprobación de la ley mediante la firma del proyecto enrolado por los presidentes de ambos cuerpos, constituye el paso previo para que el Gobernador pueda descargar su prerrogativa constitucional de aprobar o desaprobar la medida remitida.

Pasamos ahora a discutir tres aspectos específicos del proceso de aprobación de legislación que inciden sobre la controversia formulada en este caso, son éstos: la firma y remisión al Gobernador, la aprobación por el Gobernador y finalmente, el proceso de reconsideración.

**B**

Descrito el trámite legislativo, veamos ahora si la firma y remisión al Gobernador de un proyecto legislativo son deberes ministeriales. Desde antaño se ha entendido que la procedencia de un *mandamus* responde, no a la naturaleza del puesto que ocupa la persona obligada, sino al carácter de la acción solicitada. Este principio se remonta al propio *Marbury v. Madison*, 1 Cranch 137 (1803), donde expresó el Tribunal: "[i]t is not by the office of the person to whom the writ is directed, but the nature of the thing to be done, that the propriety or impropriety of

issuing a mandamus is to be determined." Ello significa que la atribución de responsabilidades a un presidente cameral no las convierte necesariamente en deberes discrecionales.

La posición predominante en la jurisprudencia estadounidense se ha encaminado a sostener que la firma y remisión por parte del presidente legislativo es un deber ministerial o discrecional según haya o falte el elemento de discreción. Así, ha expresado el Tribunal Supremo de Ohio que, debidamente aprobado un proyecto de ley, su firma y remisión son deberes ministeriales. Según el Tribunal Supremo de Ohio, por ejemplo:

> the constitutional responsibility of the presiding officers of each house to sign a certification where all of the procedural requirements for passage have been met is a ministerial duty. It is mandatory. It cannot be used as a veto power or a power with which to thwart the prompt passage of legislation.

*Maloney v. Rhodes*, 345 N.E. 2d 407, 414 (Ohio 1976).

En cambio, los deberes de firmar y remitir un proyecto de ley se han estimado discrecionales cuando la determinación de si el proyecto fue debidamente aprobado exige el ejercicio legítimo de discreción.[19] El caso de *Ex parte Echols*, 39 Ala. 698 (1866), nos sirve de ejemplo. Un Representante de Alabama solicitó que el Tribunal ordenara

---

[19] A modo de excepción, nos referimos al caso de *Scarborough v. Robinson*, 81 N.C. 409 (1879), cuyas expresiones podrían interpretarse en el sentido de establecer una regla *per se* de discrecionalidad. Obsérvese, sin embargo, que se trataba allí de una constitución estatal cuyo texto exigía la firma del proyecto, lo cual no ocurre en la Constitución del Estado Libre Asociado.

al *Speaker* de la Cámara de Representantes a remitir cierto proyecto de ley al Senado. El proyecto se había aprobado con 47 votos a favor y 22 en contra. Empero, el *Speaker* lo había declarado vencido, con el subsiguiente apoyo de la Cámara, por entender que la Constitución exigía una súper-mayoría de dos terceras partes. Al denegar el remedio solicitado, el Tribunal expresó, citamos *in extenso*:

> The speaker decided, that the bill had not passed by a vote of two-thirds of that branch of the legislature; and an appeal was taken from that decision, to the house, and the house sustained the decision of the speaker. This was a question certainly within the jurisdiction of the speaker and house to pass upon, and is not a mere ministerial duty, but one that pertains to their legislative functions, and is one over which the house has exclusive jurisdiction. No other department of the government can revise its action in this respect, without a usurpation of power.
>
> . . .
>
> This court will not interfere with either of the other coordinate departments of the government, in the legitimate exercise of their jurisdiction and powers, except to enforce mere ministerial acts required by law to be performed by some officer thereof; and not then, if the law leaves it discretionary with the officer or department. To this extent, and no farther, do the decisions of this court go, upon this branch of the subject.

El caso de *State ex rel. Davisson v. Bolte*, 52 S.W. 262 (Mo. 1899), también resulta ilustrativo. Allí, un Senador de Missouri instó un *mandamus* para que se ordenara, *inter alia*, que el Presidente de dicho cuerpo firmara un proyecto de ley y lo enviara a la Cámara de Representantes. El proyecto se había originado en el Senado y había sido objeto de un informe de conferencia que aprobaron ambas cámaras. No obstante, el Senado sometió el proyecto a una

votación final, en la cual recibió 17 votos favorables de los 34 Senadores electos. El Presidente *pro tempore* del Senado declaró derrotado el proyecto al invocar una disposición constitucional que exigía el apoyo mayoritario. Tras citar extensamente de *Ex parte Echols*, 39 Ala. 698, el Tribunal concluyó:

> So, in the case at bar, the most that can be said in support of relator's contention is that the presiding officer of the senate was in error in ruling that the bill was not passed upon the confirmation by that body of the report of the conference committee with respect thereto, and in putting it to a vote of the senate. It was with respect to a matter which came strictly within the line of his duties as the presiding officer of the senate, and not merely ministerial. His action required the exercise of judgment and discretion, and was not simply perfunctory.

50 S.W., *ante*, pág. 265.

Conviene observar cómo los criterios de la jurisprudencia citada armonizan con la función de las firmas presidenciales en nuestro ordenamiento parlamentario. Hemos visto que no se trata de un mecanismo cuyo propósito es conceder a los líderes legislativos una última oportunidad de evaluar, en los méritos, las medidas que hayan recibido el apoyo correspondiente de los representantes o senadores. Su propósito es atestiguar que determinado proyecto fue aprobado debidamente. **Resulta lógico, entonces, que la discreción conferida se limite al supuesto de que sea necesario juzgar si el proyecto fue debidamente aprobado; y que ante el evidente acato de los requisitos procesales, cese la discreción.**

Debemos tener presente, claro está, que alguna discreción legislativa existe con respecto al momento de la remisión de los proyectos. Al precisar su ámbito de operación, resultan útiles las siguientes expresiones del reconocido tratado *Sutherland's Statutory Construction*:

> Some state constitutions also prescribe the method and time within which presentment shall be made. **Where there is no express constitutional provision most courts require that bills be presented to the executive with reasonable promptness after adjournment and in a manner that accords with reasonable business practice.** Reasonable diligence in preparing bills for transmission and actually transferring them to the custody of the chief executive's office should fulfill the constitutional requirement. (Énfasis nuestro.)

*Op. cit.*, sec. 16.1 (citas omitidas).[20] Por lo tanto, **somos del criterio que en esta esfera opera un estándar de razonabilidad, por lo cual no es apropiado fijar de antemano un término fijo; todo habrá de depender de las circunstancias del momento.** La razonabilidad, como la Naturaleza, es una nube mutable que siempre y nunca es igual. R.W. Emerson, *Essays: First Series and Second Series*, Gramecy Books, New York, 1993, capt. 18.

---

[20] Como reconoce la sección citada, el Tribunal Supremo de New Jersey resolvió, en *Gilbert v. Gladden*, 432 A.2d 1351, 1355 (N.J. 1981), que, "although the legislature is constitutionally required to present passed bills to the Governor, the timing of such presentment is discretionary, and a rule or practice delaying presentment is well within the legislative prerogative." Este caso, empero, es muy distinto al de autos, pues en aquel se había impugnado un fenómeno muy particular, *viz.*, "an unofficial custom of long duration, known as gubernatorial courtesy, whereby bills that have been passed in both houses of the Legislature are not presented to the Governor for signature or veto until the Governor requests them." *Id.*, pág. 1353.

**C**

La Sección 19 del Artículo III de la Constitución del Estado Libre Asociado, ordena que el proyecto de ley aprobado sea remitido al Gobernador una vez firmado por los presidentes de los cuerpos.  Dispone la sección:

> **Cualquier proyecto de ley que sea aprobado por una mayoría del número total de los miembros que componen cada cámara se someterá al Gobernador** y se convertirá en ley si éste lo firma o si no lo devuelve con sus objeciones a la cámara de origen dentro de diez días (exceptuando los domingos) contados a partir de la fecha en que lo hubiese recibido.

> Cuando el Gobernador devuelva un proyecto, la cámara que lo reciba consignará las objeciones del Gobernador en el libro de actas y ambas cámaras podrán reconsiderar el proyecto, que de ser aprobado por dos terceras partes del número total de los miembros que componen cada una de ellas, se convertirá en ley.

> Si la Asamblea Legislativa levanta sus sesiones antes de expirar el plazo de diez días de haberse sometido un proyecto al Gobernador, éste quedará relevado de la obligación de devolverlo con sus objeciones, y el proyecto sólo se convertirá en ley de firmarlo el Gobernador dentro de los treinta días de haberlo recibido.

> **Toda aprobación final o reconsideración de un proyecto será en votación por lista.** (Énfasis nuestro.)

La disposición constitucional antes transcrita es un claro ejemplo de que el poder de legislar, conforme la estructura constitucional establecida, es un poder compartido por los poderes políticos del Estado.  El Art. III, Sec. 19 de la Constitución a la sazón, impone deberes y obligaciones recíprocas al Gobernador y a la Asamblea Legislativa. *E.g., The Pocket Veto Case*, 279 U.S. 655, 678

(1929); *Myers v. United States,* 272 U.S. 52, 123 (1926);

*INS v. Chadha*, 462 U.S. 919, 951 (1983). Es entonces en

función de esa reciprocidad de tenor constitucional, que

hay que contextualizar y matizar la controversia ante

nuestra consideración.

**D**

La Sección 19, Art. III, antes citada, incorpora a la

Constitución el mecanismo de reconsideración. Durante el

debate de la Convención Constituyente sobre esta

disposición, se suscitó la siguiente discusión referente a

este asunto, citamos *in extenso*:

> Sr. Presidente: ¿Alguna enmienda a la sección 13,
> [sección 19 de la Constitución]. . .?
> Sr. Fernández Méndez: Para una pregunta, señor
> Presidente. . .al Presidente de la Comisión.
> Sobre el artículo.
> . . .
> Señor Fernández Méndez: A los fines de que conste
> en [actas], señor Presidente, ¿cuál es la
> intención de la comisión? Desearíamos también
> que se nos informe si este artículo 13, tal como
> está, **en alguna forma priva a la Asamblea
> Legislativa de la facultad de pedir al [jefe],
> ejecutivo, durante los diez días que tiene él
> para firmar una ley o para devolverla a la
> Asamblea Legislativa** . . . si este artículo, tal
> como está redactado, le conserva el poder a la
> Asamblea Legislativa para, mediante resolución
> concurrente, pedir al [jefe] ejecutivo el
> proyecto que ya está en sus manos, para efectuar
> enmiendas la Asamblea Legislativa . . .
> Sr. Gutiérrez Franqui: **Entendemos que en ninguna
> forma lo impide.**
> Sr. Fernández Méndez: ¿Esa es la intención de la
> comisión?
> Sr. Gutiérrez Franqui: Y por el contrario lo
> permite.
> Sr. Fernández Méndez: ¿Lo permite? La segunda
> pregunta, ¿podría pedirse al [jefe] ejecutivo la
> devolución de un proyecto por una sola de las
> cámaras o se requeriría que ambas cámaras, por
> resolución concurrente, lo hicieran para que
> tuvieran la facultad de hacerlo?

Sr. Gutiérrez Franqui: Compañero, yo entiendo que el procedimiento parlamentario tradicional, ni siquiera requiere la resolución concurrente, sino que es una mera petición de la cámara de origen al [jefe] ejecutivo, para que él devuelva un proyecto sobre el cual todavía no ha pasado, a los fines de reconsiderarlo e introducirle enmiendas.

Sr. Fernández Méndez: No.

Sr. Gutiérrez Franqui: Y se permite todavía que subsista ese procedimiento.

Sr. Fernández Méndez: No, no, no. La razón por la cual hemos hecho la pregunta es porque...discrepamos del compañero en cuanto a la interpretación que él hace de que ésta sea una mera cuestión parlamentaria. **Esta es una cuestión sustantiva, tan sustantiva que se ha sustanciado ante los tribunales y unos tribunales han resuelto que, si la constitución no lo provee, puede no tener el poder; y en otras, que se requiere la acción conjunta de ambas cámaras y que una sola no podría hacerlo.** Por eso queríamos, señor Presidente, para ver si había necesidad de formular alguna enmienda con la venia del señor Presidente, saber cuál era la intención del comité, pero veo que la contestación a la pregunta primera nos es satisfactoria, pues vemos que puede hacerlo por resolución conjunta. Ahora, la segunda que hacemos es si podría hacerlo una sola cámara.

**Sr. Gutiérrez Franqui: Compañero, no creo que debemos dejar en [actas] la interpretación de que es por resolución conjunta. Es por petición de la cámara de origen, con el consentimiento de la otra cámara.**

**Sr. Fernández Méndez: ¿Esa es la intención del comité?**

**Sr. Gutiérrez Franqui: Y así puede seguirse haciendo.** (Énfasis nuestro.)

3 *Diario de Sesiones de la Convención Constituyente de Puerto Rico*, pág. 1949 (1961).

Resulta evidente que nuestro ordenamiento constitucional permite que aún después de aprobada una medida legislativa y estando ésta en las manos del Gobernador para su firma, las Cámaras puedan solicitar del Gobernador que la misma le sea devuelta para su

reconsideración.  **Es decir, el mecanismo de reconsideración es una prerrogativa constitucional que le asiste a la Asamblea Legislativa, que se puede ejercer aun después de que la medida haya salido del control de la Legislatura y se encuentre ante el Gobernador para su firma o veto.**

Si ello es así para aquel proyecto que ya salió del control legislativo, **soy del criterio que igual prerrogativa le asisten a los cuerpos entre sí, aun después que una medida haya sido aprobada por ambos cuerpos y esté aguardando la firma para su remisión al Gobernador.**  Ahora bien, de la misma forma que para pedir la devolución y reconsideración de un proyecto aprobado que se encuentre en manos del Gobernador se requiere que ambos cuerpos hayan prestado su anuencia; así también, cuando se desee reconsiderar un proyecto ya aprobado por los cuerpos pero sin firmar, la cámara que así lo desee deberá solicitar la anuencia del cuerpo hermano.  Obtenido el consentimiento de dicho cuerpo, procede se reconsidere la medida.  Sólo de esta forma sería válida tal reconsideración.

Cabe destacar que luego de aprobada una medida por ambos cuerpos ya la misma no representa un proyecto de ley de tal o cual cámara, sino la expresión de la Asamblea Legislativa.  En vista de lo cual, para variar la expresión Legislativa del cuerpo se requiere de la anuencia de las dos cámaras que lo componen.  De esta forma se protege el voto ya emitido por los miembros del hermano cuerpo, de lo

contrario, estaríamos frente a la anulación por una de las cámaras de los poderes de la otra y de sus miembros.

Esta es precisamente la posición que esboza don Néstor Rigual en su obra sobre el proceso legislativo en Puerto Rico. Rigual, quien fuera Secretario de la Cámara de Representantes desde 1953 a 1968, indica lo siguiente sobre la reconsideración, citamos *in extenso*:

> El trámite de reconsideración de una medida aprobada puede hacerse en cualquier momento. Si se hace en la sesión subsiguiente, aunque el proyecto sea del otro Cuerpo, no es necesario pedir consentimiento a la Cámara de origen. Tampoco es menester solicitar devolución, si el proyecto se halla en el Cuerpo que interesa la reconsideración. Si ésta se formula después que el proyecto ha sido remitido o devuelto al otro Cuerpo, se requiere entonces que, junto con la solicitud de consentimiento para reconsiderar, se pida la devolución de la medida.
>
> La devolución para reconsiderar, se hace si el proyecto ha sido ya aprobado por una de las Cámaras, y se encuentra ante la consideración de la otra. **Pero, si hubiere sido aprobado por ambas Cámaras, y todavía no firmado por el Presidente del Cuerpo de origen, porque éste deseare reconsiderarlo, entonces aquél solicita el consentimiento del otro Cuerpo para entrar en la reconsideración.**
>
> En caso que la última Cámara que aprobó el proyecto acuerde reconsiderarlo después de haberlo devuelto a la Cámara de origen, entonces aquélla puede solicitar y obtener la devolución. En cambio, el caso es el opuesto cuando un proyecto de ley o resolución conjunta ha sido debidamente firmado en ambas Cámaras. Como la medida pasa a ser cosa única de la Asamblea Legislativa para que una Cámara pueda entrar en la reconsideración de aquélla tiene que solicitar el consentimiento de la otra.
>
> Pero hay más. **Aun habiendo sido firmado y remitido al Gobernador, un proyecto de ley puede ser reconsiderado, previa solicitud de una Cámara a la otra, interesando su consentimiento para pedir al Gobernador la devolución del proyecto.**

**Obtenido tal consentimiento, se envía una comunicación al Gobernador de Puerto Rico urgiendo dicha devolución.** Si hasta el momento de recibir la solicitud el Gobernador no ha tomado acción respecto del proyecto, corresponde al Ejecutivo ordenar la devolución, como cuestión de cortesía al Poder Legislativo. (Énfasis nuestro.)

La reconsideración por uno de los cuerpos legislativos de un proyecto de ley ya aprobado no es un procedimiento extraño a nuestro esquema constitucional.[21] Sabiamente, nuestros constituyentes previeron para ello. La pregunta a formularse en esta ocasión y ante el cuadro traído a nuestra consideración es entonces si se cumplió con el trámite correspondiente en este caso.

Apliquemos entonces la doctrina antes descrita a los hechos en controversia en este caso.

**V**

Iniciamos puntualizando que cada Cámara tiene amplia facultad para adoptar las reglas que estime propias para gobernar sus trámites internos; siempre y cuando, claro está, éstas sean consistentes con el ordenamiento constitucional. *Mason's Manual of Legislative Procedure* ("*Mason's Manual*"), National Conference of State Legislatures, West Group, Colorado, ed. 2000, sec. 10.3,

---

[21] La interpretación en este sentido que hace en su obra don Néstor Rigual sobre la reconsideración y a la que hicimos referencia extensamente, es de gran valor persuasivo habida cuenta que la misma es coetánea al momento inmediatamente posterior a la aprobación de la Constitución. Queda expuesta además por quien fuera precisamente en ese momento Secretario de la Cámara de Representantes. La interpretación contemporánea tiene siempre importancia en el ejercicio de la función judicial y es por ello que debemos considerarla. *Hernández Agosto v. Romero Barceló*, 112 D.P.R. 407, 423 (1982).

pág. 19 ("The power of each house of a state legislature to make its own rules is subordinate to the rules contained in the constitution.")  Cada Cámara está facultada para enmendar o suspender en cualquier momento su propio reglamento, o cualquier disposición del mismo.  *Mason's Manual*, sec. 14.

Por lo tanto, nada impedía que la Cámara de Representantes en la sesión del pasado 27 de junio dejara sin efecto la Sección 40.1 del Reglamento de la Cámara de Representantes donde se establecía bajo qué circunstancias se podía solicitar la reconsideración de una medida ya aprobada.  No le corresponde al Poder Judicial pasar juicio sobre esa determinación, pues es un asunto interno de cómo se conducen los procedimientos en dicho cuerpo.

Ahora bien, lo que la Cámara no podía hacer era, sin tener la previa autorización del Senado de Puerto Rico, proceder con la reconsideración de la medida aprobada. Indicamos anteriormente que el proceso de reconsideración es de raigambre constitucional y que para que el mismo opere se requiere que la cámara que desee reconsiderar solicite el consentimiento de la otra cámara.  Ausente tal anuencia, como en efecto nos indicó el Senado de Puerto Rico en su comparecencia, el procedimiento seguido por la Cámara de Representantes de reconsideración del Sustitutivo P. de la C. 2193 ofende la Constitución y como tal se revela  inoficioso.

Siendo ello así y toda vez que no se ha sugerido que el proceso de aprobación del Sustitutivo P. de la C. 2193, seguido en la Cámara de Representantes el 21 de junio de 2006 incumplía con los parámetros constitucionales para la aprobación de un proyecto de ley, es un deber ministerial del Presidente de la Cámara de Representantes proceder a la firma del mismo y que el Secretario de dicho cuerpo lo remita al Gobernador dentro de un término razonable.[22]

**VI**

Esencial para nuestra convivencia democrática es el respeto que una rama de gobierno le debe a la otra. Respeto, que se traduce en el mutuo reconocimiento y resguardo de las facultades y prerrogativas de cada cual. *Misión Industrial v. Junta de Planificación*, 146 D.P.R. 64 (1998); *Banco Popular v. Corte*, 63 D.P.R. 66 (1944).

Este Tribunal ha respetado siempre ese equilibrio constitucional. No hemos vacilado cuando las actuaciones de una rama irrumpen sobre las facultades intrínsecas de otra. Así, hemos sido enfáticos al rechazar la intromisión indebida de la Asamblea Legislativa con el ejercicio de la

---

[22] Estamos conforme, por varias razones, con el término de 24 horas que se ha concedido en esta ocasión para que el señor Presidente de la Cámara de Representantes de Puerto Rico firme el proyecto aprobado y el Secretario de dicho cuerpo lo remita al Gobernador. Primero, adviértase que en este caso la legislación propuesta contemplaba que el impuesto sobre la venta que habrían de cobrar los municipios comenzaría a operar el 1ero de julio de 2006. Segundo, ya concluyeron los trabajos de la Asamblea Legislativa al concluir la primera sesión ordinaria. Finalmente, y más importante, la reforma contributiva legislada se revela necesaria para atender serios problemas fiscales y crediticios del Estado Libre Asociado de Puerto Rico, como han reconocido todas las partes.

función judicial. Véase, *Misión Industrial v. Junta de Planificación*, *ante*; *Vélez Ruiz v. ELA*, 111 D.P.R. 752 (1981); *Torres v. Castillo Alicea*, 111 D.P.R. 792 (1981); *PR Tabaco Corp. v. Buscaglia*, 62 D.P.R. 811 (1944). De la misma forma que hemos protegido celosamente nuestras prerrogativas constitucionales, hacemos lo propio respecto los otros poderes constitucionales.

De ahí que, en *Aponte Hernández v. Acevedo Vilá*, res. 16 de febrero de 2006, 166 D.P.R. ___, 2006 TSPR 24, (Rodríguez Rodríguez, Op. disidente), rechazáramos enfáticamente la actuación del Primer Ejecutivo cuando redujo unilateralmente el presupuesto de la Asamblea Legislativa. Consideramos en ese entonces que el proceder del Gobernador ofendía la Constitución y lesionaba el fino balance de poderes que la misma establece. Rehusamos reconocerle al señor Gobernador facultades extraordinarias no contempladas en la Constitución ni en las leyes, que avalasen su actuación.

En esta ocasión es uno de los cuerpos legislativos, la Cámara de Representantes, quien se ha excedido en sus facultades y ha actuado al margen de la Constitución al reconsiderar una medida aprobada de forma contraria a lo provisto en nuestra Ley Suprema. Ofende además a la Constitución que el Presidente de la Cámara de Representantes rehúse firmar la pieza aprobada para su remisión al Primer Ejecutivo. A la luz de los hechos en este caso, la firma del proyecto aprobado constituye un

deber ministerial al cual no puede rehusarse.  Rechazamos reconocerle a un cuerpo legislativo o su Presidente facultades que no están contempladas en la Constitución en perjuicio de los poderes constitucionales del Gobernador así como del Senado de Puerto Rico y sus Senadores.



                                        Anabelle Rodríguez Rodríguez
                                             Juez Asociada